Stan RUBINSTEIN [1], Appellant

v.

LUCCHESE, INC., Appellee

NO. 02–15–00317–CV

Court of Appeals of Texas, Fort Worth.

DELIVERED: July 7, 2016

---

1. The appellant's last name has been variously spelled Rubinstein and Rubenstein. Documentation he signed indicates the true spelling is Rubinstein, which is the spelling used hereafter.

618 

Kenneth C. Johnston, Catherine E. (Kate) Gaither; Kane Russell Coleman & Logan PC, Dallas, Texas, for Appellant.

David F. Farris, John R. Lively, Daniel R. Aguilar; Lively & Associates, L.L.P., Fort Worth, Texas, for Appellee.

PANEL: DAUPHINOT and GARDNER, JJ.; and KERRY FITZGERALD (Senior Justice, Retired, Sitting by Assignment).

## OPINION

KERRY FITZGERALD, JUSTICE

### I. INTRODUCTION

In this accelerated, interlocutory appeal, Appellant Stan Rubinstein challenges the trial court's order denying his special appearance. We affirm.

### II. BACKGROUND

This case presents the question of whether the trial court may exercise personal jurisdiction over Rubinstein as an individual nonresident "guarantor." Rubinstein claims he did not execute a guaranty, but even if such a guaranty existed, Rubinstein claims there are not the requisite minimum contacts such that a Texas court can exercise specific jurisdiction over him.

According to the petition, in March of 2003, Rubinstein, a Pennsylvania resident, purchased the Pennsylvania corporation Sterling Leather Enterprises, Inc. and became president. The petition alleged Rubinstein's purposeful acts in contacting Appellee Lucchese, Inc. in Texas, seeking a credit account and asking Lucchese to provide Rubinstein with boots and other western merchandise. The parties exchanged correspondence and financial documents. On July 21, 2005, Lucchese sent Rubinstein a letter as follows:

Stan,

Recently during a routine audit, it has been brought to our attention that we do not have a current credit application on file for Sterling Leather Enterprise. In order to continue to process orders without interruption, we must have the attached credit application completed and returned to us. Please make sure everything is filled in on the application, and signatures provided where indicated, including the personal guaranty. If possible, please attach a copy of your most current financial statement.

We are excited that your business is growing and that your sales with LUCCHESE are increasing. We value your business and appreciate your understanding in providing the requested information so that we are in compliance with the LUCCHESE Credit Department Policies and Procedures.

Rubinstein replied in a fax dated July 26, 2005:

I am faxing to you the information forwarded to Mona dated April 4, 2003. This information contained a completed application and a financial statement for March 2003. As you know, I have been buying from Lucchese for years and have always paid my bills promptly. I do not like to complete duplicate guarantees and so I am forwarding an updated financial statement for your records.

Lucchese shipped merchandise from Texas to Rubinstein's offices in Pennsylvania or to the address of Sterling Leather's customers continuously from March 2003 to February 2015. During this time, Rubinstein communicated with Lucchese at its offices in Texas by mail, email, and telephone.

On June 5, 2015, Lucchese sued Sterling Leather and Rubinstein. This suit on a sworn account sought to collect monies Lucchese claimed Sterling Leather and Rubinstein owed Lucchese. Specifically, Lucchese pleaded that Sterling Leather owed Lucchese $208,718.30 for goods that Lucchese had provided to Sterling Leather. Lucchese further pleaded that Rubinstein, as Sterling Leather's personal guarantor, was liable for the debt as well.[2]

Rubinstein filed his verified special appearance, wherein he stated that he "[did] not have sufficient minimum contacts with Texas under either a general or specific jurisdiction theory to support the assertion of personal jurisdiction over him." Rubinstein asserted that he was a lifelong resident of Pennsylvania and was president of Sterling Leather, a corporation he purchased in March 2003, which did business with Lucchese. However, Rubinstein asserted that he had never been in Texas, done business in Texas, or owned property in Texas. Rubinstein further stated he "ha[d] never represented that he would financially back Sterling Leather" and that Lucchese's claim against him is based on "an alleged guaranty of Sterling Leather's obligations" but that Lucchese "fails to produce any guaranty or agreement."

### III. SPECIAL-APPEARANCE HEARING

At the special-appearance hearing, Rubinstein testified that he had never lived in Texas, had never traveled to Tex-

---

2. Neither Sterling Leather nor Rubinstein initially answered Lucchese's suit. Thus, the trial court entered a default judgment against both Sterling Leather and Rubinstein on July 14, 2015. On September 17, 2015, Rubinstein specially appeared and simultaneously moved for the trial court to set aside the default judgment. Sterling Leather also ap- peared and moved for the trial court to set aside the default judgment. Following a hearing, the trial court set aside the default judgment as to Rubinstein but denied Sterling Leather's motion. The trial court denied Rubinstein's special appearance. This interlocutory appeal regarding Rubinstein's special appearance followed.

as, and had not conducted business of any kind in Texas. Rubinstein also averred that he had never owned any real or personal property in Texas, nor had he ever maintained bank accounts, assets, nor paid taxes in Texas.

Rubinstein stated that he was the sole owner of his new corporation, Sterling Leather, and wanted it to do business with Lucchese. He, therefore, applied for a credit account, sending a credit application and financial statement of his corporation using his own forms, not Lucchese's forms. Rubinstein said that although he provided his name, date of birth, and social security number to Lucchese, he did not provide his own personal financial information, nor did he personally guarantee Sterling Leather's debts.

Rubinstein averred that two years into the agreement with Lucchese, Lucchese sent the July 21, 2005 letter wherein Lucchese asked Rubinstein to "complete ... their credit application along with a personal guaranty which was part of [the] application." Rubinstein testified that he did not complete either of these documents. Rubinstein acknowledged that, in response to Lucchese's request, he sent a fax which stated in part: "I do not like to complete duplicate guarantees...." When asked what he meant by this, Rubinstein testified, "What I was referring to is that I had already sent a credit application back in 2003, and there was no need for me to resend the credit application that I had originally sent." He specifically denied signing any personal guaranty on behalf of Sterling Leather. Rubinstein said that on occasion he contacted Lucchese by telephone, always in his capacity as president of Sterling Leather and not in his individual capacity.

The affidavit of Lucchese's Senior Credit Manager, Jerardo Chavira, was admitted without objection. The Chavira affidavit read in part:

4. Lucchese is in the business of providing boots and other western wear merchandise and accessories to customers such as Sterling Leather Enterprises, Inc., ("Sterling Leather") which is in the business of selling such merchandise to end consumers.

5. Sterling Leather is a Pennsylvania corporation, and Stan Rubinstein is the owner and president of Sterling Leather.

6. The business relationship between Lucchese, Sterling Leather[,] and Rubinstein began on or around 2003 when Sterling Leather contacted Lucchese in the State of Texas and sought for Lucchese to provide Sterling Leather with merchandise for sale.

. . . .

8. Under the business arrangement between the parties, Lucchese would ship its goods from the State of Texas to Sterling Leather's location in Pennsylvania or from the State of Texas to the address of Sterling Leather's customers designated in the purchase orders. Over the course of the business relationship, Sterling Leather, through Mr. Rubinstein, would contact Lucchese by phone, fax, and other means at the Lucchese office in Texas. Payment under the arrangement would be received by Lucchese at its El Paso office in Texas.

. . . .

11. On or before 2004, Lucchese and Stan Rubinstein entered into a written agreement by which Stan Rubinstein agreed to guaranty Sterling Leather's debts to Lucchese, in consideration for Lucchese extending credit to Sterling

Leather. I know this to be true for several reasons stated below.

12. Attached as Exhibit A–2 is a true and correct copy of a 2005 letter from Stan Rubinstein to Lucchese's office in El Paso, Texas, sent by facsimile to the El Paso fax number at (915)778–6796.

13. As shown in Exhibit A–2, Mr. Rubinstein acknowledges his company's long relationship with Lucchese and then states that he does "not like to complete duplicate guarantees," and forwards a financial statement instead—a statement which acknowledges that a guaranty with Lucchese exists.

14. It is Lucchese's standard business practice to obtain a personal guaranty from the owners of corporations (and other limited liability entities) such as Sterling Leather before extending credit to the corporation or entity. Guaranties such as this are a condition of the extension of credit Lucchese requires to protect its financial interests. I have no reason to believe that Lucchese deviated from the practice of obtaining guaranties in its dealings with Sterling Leather and Stan Rubinstein—especially in light of Rubinstein's statements in Exhibit A–2.

15. At this time, Lucchese has been unable to locate a copy of the guaranty agreement and standard credit agreement for Sterling Leather. However, due to the frequency with which Lucchese uses such agreements, the terms are well known to me and include the following: the principal of the company agrees to guarantee the payment of all indebtedness incurred by the subject company in consid-eration for Lucchese's extension of credit to the company; the extension of credit is conditioned on the parties['] agreeing that the laws and jurisdiction of the State of Texas govern the agreement.

16. Due to Lucchese's standard practice of using such agreements referenced in the paragraph above, along with Mr. Rubinstein's acknowledgement that a guaranty exists, as shown in Exhibit A–2, Mr. Rubinstein entered into a written guaranty to pay Sterling Leather's debts to Lucchese on the terms described in Paragraphs 14 and 15 above.

17. [Explanation for misplacement of document.]

## IV. DISCUSSION

Rubinstein argues that the trial court erred by denying his special appearance because (a) there is no evidence of a written guaranty but (b) even if there was a written guaranty, Rubinstein "does not have the requisite minimum contacts with Texas such that he could reasonably anticipate being haled into court in Texas." We disagree.

### A. Standard of Review and Burden of Proof

 Whether a trial court has personal jurisdiction over a defendant is a question of law that we review de novo. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex.2002). If, as in this case, the trial judge does not issue findings of fact and conclusions of law, we imply all fact findings supported by the evidence that are necessary to support the ruling. *Capital Tech. Info. Servs., Inc. v. Arias & Arias Consultores*, 270 S.W.3d 741, 748 (Tex.App.—Dallas 2008, pet. denied). The trial judge's implied findings are not con-

clusive and may be challenged for legal and factual sufficiency on appeal. *Id.*

■■■ The plaintiff bears the initial burden of pleading sufficient facts to bring a nonresident defendant within the reach of the Texas long-arm statute. *Retamco Operating, Inc. v. Republic Drilling Co.,* 278 S.W.3d 333, 337 (Tex.2009). The specially appearing defendant must then negate all bases of personal jurisdiction that have been pleaded by the plaintiff. *Moki Mac River Expeditions v. Drugg,* 221 S.W.3d 569, 574 (Tex.2007); *Am. Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 807 (Tex.2002), *cert. denied,* 537 U.S. 1191, 123 S.Ct. 1271, 154 L.Ed.2d 1025 (2003). Alternatively, the defendant can show that even if the facts alleged by the plaintiff are true, the evidence and facts are legally insufficient to establish the propriety of jurisdiction over the defendant. *Kelly v. Gen. Interior Constr., Inc.,* 301 S.W.3d 653, 659 (Tex.2010). If the plaintiff fails to plead any jurisdictional facts, the defendant carries his burden by proving that he is not a resident of Texas. *See id.* at 658–59.

**B. Personal Jurisdiction**

■■■ The Texas long-arm statute reaches as far as due process allows. *BMC Software,* 83 S.W.3d at 795. Accordingly, a Texas court may exercise personal jurisdiction over a nonresident defendant if (1) the defendant has minimum contacts with Texas and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Id.* (*citing Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)).

■■■ The minimum-contacts test focuses on the question of whether the defendant has purposefully availed himself of the privilege of conducting activities in the forum state. *See Michiana Easy Livin'*

*Country, Inc. v. Holten,* 168 S.W.3d 777, 784 (Tex.2005). Three principles guide the minimum-contacts analysis. *Johnson v. Kindred,* 285 S.W.3d 895, 899 (Tex.App.— Dallas 2009, no pet.). First, we must disregard any forum contacts by the defendant that resulted solely from the unilateral activity of another party or a third person. *Id.* Second, the defendant's contacts with the forum state must be purposeful rather than random, isolated, or fortuitous. *Id.* And third, the defendant must have sought some benefit, advantage, or profit from his forum-directed activities and invoked the benefits and protections of the forum's laws. *Id.* The defendant's actions must justify a conclusion that he could reasonably anticipate being called into the courts of the forum state. *Retamco Operating, Inc.,* 278 S.W.3d at 338. "[T]he minimum-contacts analysis is focused on the quality and nature of the defendant's contacts, rather than their number." *Id.*; *Am. Type Culture Collection, Inc.,* 83 S.W.3d at 806; *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 483, 105 S.Ct. 2174, 2188, 85 L.Ed.2d 528 (1985).

■■■ A defendant's contacts with a forum can give rise to either (a) general jurisdiction or (b) specific jurisdiction. *CSR Ltd. v. Link,* 925 S.W.2d 591, 595 (Tex.1996) (orig.proceeding). A plaintiff must demonstrate contacts of a more extensive quality and nature between the forum state and the defendant to support general jurisdiction than those needed to support specific jurisdiction. *Id.* That the defendant refrained from physically entering the forum state is not of itself sufficient to avoid jurisdiction if a substantial connection otherwise exists. *Id.*

■■■ In this case, Lucchese relies exclusively on "specific jurisdiction," which occurs when a defendant's alleged liability arises from or is related to an activity

conducted within the forum state. Lucchese asserts claims that arise from or relate to Rubinstein's forum-state contacts. The minimum-contacts test focuses on the relationship among the defendant, the forum state, and the litigation. *Johnson,* 285 S.W.3d at 899; *PHC–Minden, L.P. v. Kimberly–Clark Corp.,* 235 S.W.3d 163, 168–69 (Tex.2007). Specific-jurisdiction minimum contacts are present if (1) the defendant has purposefully availed himself of the privilege of conducting activities in the forum state and (2) there is a substantial connection between those contacts and the operative facts of the litigation. *Id.* Even a single contact can support jurisdiction, as long as it creates a substantial connection with the forum state. *Burger King Corp.,* 471 U.S. at 475 n. 18, 105 S.Ct. at 2183–84.

The exercise of personal jurisdiction over a nonresident must also comport with traditional notions of fair play and substantial justice. *Capital Tech. Info. Servs., Inc.,* 270 S.W.3d at 750. Several factors bear on that determination: (1) the burden on the nonresident defendant, (2) the forum's interest in adjudicating the dispute, (3) the plaintiffs interest in convenient and effective relief, (4) the interstate judicial system's interest in the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering substantive social policies. *Id.* These considerations can serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required. *Burger King Corp.,* 471 U.S. at 477, 105 S.Ct. at 2184.

**C. Issue is Personal Jurisdiction, Not Merits of Cause of Action**

Rubinstein argues that the trial court "stated that it did not decide whether a guaranty exists" and that Lucchese's "sole basis for jurisdiction over [him] rests on the existence of a guaranty." Thus, according to Rubinstein, the trial court could not have predicated its ruling on finding that Rubinstein guaranteed Sterling Leather's debts. In support of this argument, Rubinstein points this court to the trial court's statement made at the close of the special-appearance hearing wherein the trial court stated, "The issue before the Court is not whether or not there was a guaranty. Obviously, that's disputed. But I do believe that under the law and the facts of the case that I will deny" Rubinstein's special appearance.

It is clear from the arguments of counsel and from Lucchese's response to Rubinstein's special appearance that the trial court was stating that it was not addressing the ultimate validity of Rubinstein's guaranty; rather, it was merely deciding the issue of personal jurisdiction. *See Wattles v. Minerva Partners, Ltd.,* No. 07–12–00096–CV, 2012 WL 4120251, at *2 (Tex.App.—Amarillo Sept. 19, 2012, no pet.) (mem.op.) (reasoning that the issue in appellant's special appearance was whether the trial court could exercise personal jurisdiction over appellant and not whether there was a viable cause of action or that appellant's claims that his guarantee was void defeated personal jurisdiction).

The issue in question is whether the trial court can exercise personal jurisdiction over Rubinstein given his contacts with Texas, not whether Lucchese has a viable cause of action against him. Personal jurisdiction may exist even if the plaintiff ultimately loses his suit or has less than a certain claim. *Id.* The presence of personal jurisdiction is not dependent upon the merits of the underlying cause of action. *See id.; see also Michiana Easy Livin' Country, Inc.,* 168 S.W.3d at 790 (cautioning against "equating the jurisdictional inquiry with the underlying merits" of the case).

## D. Existence of Rubinstein's Personal Guaranty

■ Rubinstein contends that the trial court erred by denying his special appearance because there is no evidence of a written guaranty. Rubinstein argues that Lucchese failed to present "any credible evidence" of the existence of a guaranty and that, conversely, he "testified unequivocally that he did not sign a guaranty." Rubinstein argues that the "only evidence that a guaranty *could* exist consists of the self-serving affidavit of Jerardo Chavira" in which he admits it has been misplaced and "opines that it exists because Lucchese usually requires customers to sign such an agreement." [Emphasis in original.] Lucchese responds that the evidence—Rubinstein's fax and Chavira's affidavit—is sufficient to prove Rubinstein previously executed a guaranty.

■ In reviewing the documents in this case, we apply the normal rules used in construing a written contract. *Healthcare Cable Sys., Inc. v. Good Shepherd Hosp., Inc.*, 180 S.W.3d 787, 791 (Tex. App.—Tyler 2005, no pet.). Our primary concern is to ascertain the true intentions of the parties as expressed in the instrument. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983); *see also Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex.1995). We examine and consider the entire writing to harmonize and give effect to all the provisions so that none will be rendered meaningless. *Coker*, 650 S.W.2d at 393. No single provision taken alone will be given controlling effect. *Id.*; *Myers v. Gulf Coast Minerals Mgmt. Corp.*, 361 S.W.2d 193, 196 (Tex. 1962).

■ If the contracts are so worded that they can be given a certain or definite legal meaning or interpretation, then they are not ambiguous, and the court will construe them as a matter of law. *Coker*, 650 S.W.2d at 393. The interpretation of an unambiguous contract is a question of law, which we review de novo. *See MCI Telecomm. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 650–51 (Tex.1999). Ambiguity does not arise simply because the parties advance conflicting interpretations of the contract; rather, for an ambiguity to exist, both interpretations must be reasonable. *Lopez v. Muñoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex.2000). We give terms their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used such terms in a technical or different sense. *Id.* at 864. Finally we enforce an unambiguous agreement as written. *Id.* at 862. We are not permitted to rewrite an agreement to mean something it did not. *Healthcare Cable Systems, Inc.* at 791. We cannot change the contract simply because we or one of the parties comes to dislike its provisions or thinks something else is needed in it. *Id.* Parties to a contract are masters of their choices and are entitled to select what terms and provisions to include in or omit from a contract. *Id.* In the case before us, neither party claims ambiguity.

■ In *National Union Fire*, the court addressed parol evidence. 907 S.W.2d at 520. The court stated only where a contract is first determined to be ambiguous may the courts consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the instrument. *See Id.* (*citing Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 732 (Tex.1981) and *R & P Enterprises v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex.1980)). In this case, the trial court did not decide that the contract was either patently or latently

ambiguous.[3]

Lucchese's letter of July 21, 2005, to Rubinstein and Rubinstein's faxed reply dated July 26, 2005, set the stage. In our review of these two documents, we give the terms their plain, ordinary, and generally accepted meaning.

The proverbial *elephant in the room* is one statement in Rubinstein's reply fax. The statement reads: "I do not like to complete *duplicate guarantees* and so I am forwarding an updated financial statement for your records." [Emphasis added.]

Rubinstein minimizes this fax, referring to it as "the 10–year[–]old facsimile coversheet." This fax, however, is at the heart of this case. The age of the fax is important, not as Rubinstein would suggest, but because it was composed at or about the time the business affairs actually occurred, when memories were fresh and prior to any suggestion of litigation. The author of the fax is important. This is not just a document the contents of which contradict Rubinstein. This is a document actually written by Rubinstein. The content of the fax is important. The quoted statement regarding "duplicate guarantees" is a revealing admission by Rubinstein that another guaranty had been executed. *See*

*Material P'ships, Inc. v. Ventura*, 102 S.W.3d 252, 259–63 (Tex.App.—Houston [14th Dist.] 2003, pet. denied) (stating that "I, personally, guaranty" means person executed guaranty as individual). The fax, therefore, constitutes substantial evidence that the guaranty exists.

At the special-appearance hearing, Rubinstein's counsel, referring to the reply fax, asked Rubinstein what he meant when he said, "I do not like to complete duplicate guarantees," and he answered, "What I was referring to is that I had already sent a credit application back in 2003, and there was no need for me to resend the credit application that I had originally sent." But his fax started off by saying he was resending the credit application. Rubinstein's testimony concerning pivotal language in the reply fax is so incoherent as to be absurd. The elephant in the room ("duplicate guarantees") posed an insurmountable obstacle for which Rubinstein simply could not give a rational explanation. "Duplicate guarantees" are words with definite meaning and do not allow for substitution or rationalization in this case.[4]

Rubinstein's testimony attempts to rewrite the fax. He takes the liberty of substituting "credit application" for "dupli-

---

**3.** An ambiguity may be said to be "patent" or "latent." A patent ambiguity is evident on the face of the contract. *See Universal Home Builders, Inc. v. Farmer*, 375 S.W.2d 737, 742 (Tex.Civ.App.—Tyler 1964, no writ). A latent ambiguity arises when a contract which is unambiguous on its face is applied to the subject matter with which it deals and an ambiguity appears by reason of some collateral matter. *See Murphy v. Dilworth*, 137 Tex. 32, 36, 151 S.W.2d 1004, 1005 (Tex.1941); *see also Bache Halsey Stuart Shields, Inc. v. Alamo Sav. Ass'n of Tex.*, 611 S.W.2d 706, 708 (Tex.Civ.App.–San Antonio 1980, no writ). If a latent ambiguity arises from this application, parol evidence is admissible for the purpose of ascertaining the true intention of the parties as expressed in the agreement. *See Murphy*, 137 Tex. at 36, 151 S.W.2d at 1005.

If the contract language is not fairly susceptible of more than one legal meaning or construction, however, extrinsic evidence is inadmissible to contradict or vary the meaning of the explicit language of the parties' written agreement. *Hubacek v. Ennis State Bank*, 159 Tex. 166, 170–71, 317 S.W.2d 30, 31–32 (Tex. 1958); *Lewis v. East Tex. Fin. Co.*, 136 Tex. 149, 154, 146 S.W.2d 977, 980 (Tex.1941).

**4.** "There are no facts, only interpretations" portends no wisdom or justice. Friedrich Nietzsche (1844–1900). Wicks, Robert, "Friedrich Nietzsche," *The Stanford Encyclopedia of Philosophy* (Summer 2016 Edition), Edward N. Zalta (ed.), URL = <http://plato.stanford.edu/archives/sum2016/entries/nietzsche/>.

cate guarantees," substantially altering its original meaning. His testimony completely ignores the language "duplicate guarantees" and fails to explain the point in using the word "duplicate" for any reason other than its accepted meaning, i.e., to designate that there was another previously executed guaranty.

On appeal, Rubinstein advances yet another argument: "In response to Lucchese's request for a new credit application and a personal guaranty, he forwarded the previous credit application—not a previous guaranty—because he does not like to complete duplicate credit applications. Rubinstein clearly testified to this fact." Rubinstein argues it is all the result of a "typo." This explanation is not supported by his testimony or the record. As before, Rubinstein takes the liberty of substituting "credit application" for "duplicate guarantees," thus attempting to rewrite the fax and to substantially alter its original meaning.

In addition, Rubinstein's explanation fails to come to grips with the context of the admission. We are mindful that we should consider the entire writing to harmonize and give effect to all the provisions so that none will be rendered meaningless. See Coker, 650 S.W.2d at 393. When Lucchese's audit disclosed that Rubinstein's financial documents were misplaced, Lucchese sent a letter to Rubinstein to remedy this situation "[i]n order to continue to process orders without interruption." Lucchese's company policy required a personal guaranty before Lucchese would extend credit. Lucchese's letter voiced financial concerns—that Lucchese's file lacked certain financial documentation, and "[i]n order to continue to process orders without interruption," Lucchese requested certain financial documentation.

In response to these financial concerns, Rubinstein sent his reply fax recounting his prompt payment history, referring to the "duplicate guarantees," and sending an updated financial statement.

We must review the evidence as we find it. We, therefore, focus upon the express language of the letter and the fax and reject Rubinstein's attempts to rewrite the fax and to substantially alter its meaning. We will tolerate none of this posturing and, therefore, decline Rubinstein's invitation to compromise the clear meaning of this document.

In addition to the fax, Lucchese's senior credit manager signed an affidavit in which he testified that Lucchese's standard business practices required the execution of a personal guaranty before Lucchese would extend credit in such business transactions. He also stated that Rubinstein's fax confirmed the existence of the guaranty.

Rubinstein's summary of the affidavit is not accurate, and his description of it as self-serving is misleading. The senior credit manager spelled out Lucchese's standard business practices, which Rubinstein did not challenge. The senior credit manager did not, as Rubinstein states on appeal, say Lucchese "usually" required a customer to sign a guaranty, obviously suggesting it was not always done. The senior credit manager stated that guaranties are a condition of the extension of credit by Lucchese to protect its financial interests. He also relied upon the fax. He stated that a guaranty existed based on company policy and on Rubinstein's statement in the reply fax. The record does not show that he embellished or exaggerated Rubinstein's account in any manner, such as to make the affidavit self-serving.

On the other hand, Rubinstein's testimony, given after litigation had commenced, can be described as self-serving. Rubinstein testified several times that he not only did not execute a guaranty in this

case but also never executed a guaranty of corporate indebtedness for any vendor. He testified that all his contacts were in a corporate capacity, which would necessarily include all contacts and negotiations surrounding his personal guaranty. As already noted, he attempted to rationalize away why "duplicate guarantees" appeared in his reply fax.[5] In view of Rubinstein's testimony, it is rather remarkable that Rubinstein did not state in his reply fax that he had never executed a personal guaranty on behalf of Sterling Leather and declined to do so.

We conclude Rubinstein's fax confirmed execution of a prior personal guaranty in compliance with Lucchese's business practices. Rubinstein's argument that Lucchese had failed to rebut Rubinstein's unequivocal denial that he ever executed a personal guaranty is disingenuous and without merit. Furthermore, we must imply that the trial court resolved the conflict between Rubinstein's fax, Chaviro's affidavit, and Rubinstein's testimony in favor of the trial court's ruling denying Rubinstein's special appearance. We conclude the record contains proof of Rubinstein's personal guaranty.

### E. Minimum Contacts of Nonresident Guarantor

■■■ Rubinstein contends that the trial court erred by denying his special appearance because even if there was a written guaranty, Rubinstein does not have the requisite minimum contacts such that a Texas court can exercise specific jurisdiction over him. Rubinstein's brief concentrates entirely upon the premise that there was no guaranty. When Rubinstein does argue that even if a guaranty did exist ("[t]o the extent that the court may have considered the alleged guaranty in deciding whether Rubinstein individually had

contacts with Lucchese and Texas"), Rubinstein immediately reverts back to his premise—that "the unrebutted evidence shows that Rubinstein did not sign a guaranty." At this juncture, in a footnote, Rubinstein asserts:

> The existence of a guaranty alone does not subject Rubinstein to personal jurisdiction in Texas. Even if Rubinstein executed a personal guaranty with Lucchese—which he did not—that act alone does not automatically subject him to personal jurisdiction in Texas. See, e.g., Valero Mktg. & Supply Co. v. Gen. Energy Corp., 702 F.Supp.2d 706, 717–18 (S.D.Tex.2010); U.S. Rest. Props. Operating L.P. v. Aloha Petroleum, Ltd., No. CIV.A.3:01–CV–0987–D, 2001 WL 1568762, *2–*3 (N.D.Tex. Dec. 5, 2001); Brown v. Pennington, No. 05–14–01349–CV, 2015 WL 3958618, *13 (Tex.App.—Dallas June 30, 2015, no pet.).

Lucchese, of course, made no such blanket argument, as will be noted. In Rubinstein's reply brief, he attempts to distinguish Lucchese's authorities, culminating with the statement that Valero made it clear that "merely executing a guaranty with a choice of law provision favoring Texas, forwarding it to Texas[,] and receiving credit from Texas is not enough to confer jurisdiction over a guarantor in Texas." In view of these cursory statements, we will review the principal cases that set forth the applicable law.

The issue of the amenability of a nonresident guarantor to suit in Texas has been reviewed in differing factual contexts. See Nat'l Truckers Serv., Inc. v. Aero Sys., Inc., 480 S.W.2d 455, 458–59 (Tex.Civ. App.—Fort Worth 1972, writ ref'd n.r.e.); see also J.D. Fields & Co. v. W.H. Streit, Inc., 21 S.W.3d 599, 604 (Tex.App.—Houston [1st Dist.] 2000, no pet.); Gubitosi v.

5. Obviously, a personal guaranty would increase Rubinstein's financial exposure.

*Buddy Schoellkopf Prods., Inc.,* 545 S.W.2d 528, 530–31 (Tex.Civ.App.—Tyler 1976, no writ). Each case must be judged on its particular facts. *Kulko v. Superior Ct.,* 436 U.S. 84, 92, 98 S.Ct. 1690, 1697, 56 L.Ed.2d 132 (1978) ("[T]he 'minimum contacts' test . . . is not susceptible of mechanical application; rather, the facts of each case must be weighed.").

In *National Truckers,* National Truckers had been doing business with Transystems, Inc., a corporate subsidiary of Aero, a Florida corporation, when the subsidiary's account went delinquent. 480 S.W.2d at 458–59. National took steps to cancel credit cards issued to Transystems. *Id.* Aero, through its president, agreed to guarantee any and all debts of Transystems owing to National, and Aero executed such a guaranty agreement and mailed it to National in Fort Worth, Texas. *Id.* In reliance on this guaranty, National continued to extend credit to Transystems. *Id.* Payments were to be made at the company office in Fort Worth, and it was performable by guarantors in Fort Worth. *Id.* Upon default, National sued Aero to collect a debt arising from a written guaranty agreement. *Id.* This court held that Aero had sufficient minimum contacts with Texas to give rise to specific jurisdiction. *Id.* at 460.[6]

In *Gubitosi,* a New York guarantor was held subject to suit in Texas. 545 S.W.2d at 531. Gubitosi was a resident of New York and the president and major stockholder of Parker Corp., a New York corporation that bought sports-related merchandise from two Texas companies. *Id.* at 531. He had no offices in Texas and had never been to Texas. *Id.* When Par-

ker Corp. failed to pay invoices, the Texas companies agreed to accept corporate promissory notes for the balance and advance future credit only if Gubitosi executed guaranty agreements making him individually liable for his corporation's promissory notes. *Id.* at 532. Gubitosi's employee mailed the guaranty agreements and the notes from New York to Dallas, Texas. *Id.* at 534. The notes specifically provided for payments in Dallas, Texas. *Id.* Although the guaranty agreements did not designate a place of payment, the court held that by implication, the guaranty agreements likewise provided for payment in Dallas, Texas. *Id.* at 534–35. The court held that Gubitosi's contacts were sufficient to satisfy the due process minimum-contacts test. *Id.*

In *Marathon Metallic Building Co. v. Mountain Empire Construction Co.,* a Colorado corporation, Mountain Empire, distributed in Colorado the products of Marathon, a Texas corporation. 653 F.2d 921, 922 (5th Cir.1981). A Mountain Empire principal, Ginther, and two associates entered into a broad guaranty of its obligations to Marathon. *Id.* Ginther was then a corporate officer, director, and shareholder. *Id.* Soon after the guaranty was sent to Texas, the parties memorialized their business relationship in a contract containing a Texas choice-of-law clause. *Id.* Mountain Empire failed to pay its debts. *Id.* Marathon sued the company and Ginther, an individual guarantor, in Texas. *Id.* The court determined that the "effect of (the guaranty was) to involve Mr. Ginther in each such advance of credit over many months and purposefully to

---

**6.** In *U–Anchor Advertising, Inc. v. Burt,* the court, in reviewing the *National Truckers* decision, stated: "Of significance in that case was the fact that Aero voluntarily and purposefully agreed to guarantee the Texas debts of its Texas subsidiary. Aero should reason- ably have expected to face suit in the Texas courts in the event its subsidiary defaulted on its obligations." 553 S.W.2d 760, 763–64 (Tex.1977), *cert. denied,* 434 U.S. 1063, 98 S.Ct. 1235, 55 L.Ed.2d 763 (1978).

cause business activity, foreseeable by Mr. Ginther, in the forum state." *Id.* at 923. Thus, the individual guarantor, Ginther, had sufficient minimum contacts with the forum state. *Id.*

In *J.D. Fields & Co.,* a Texas corporation, a seller of steel sheet piling with its principal office in Houston, sued a New Jersey corporation and the defendant guarantor (president of the New Jersey corporation and resident of New Jersey). 21 S.W.3d at 601. Plaintiff initiated negotiations on a public works project by faxing its price list to defendant company. *Id.* Defendant company placed an order, but based on a credit check, plaintiff refused to extend credit to the defendant company. *Id.* Defendant guarantor telephoned plaintiff's Houston office, offered to personally guarantee the indebtedness, and confirmed the guaranty by letter.[7] *Id.* The defendant company faxed a performance bond and mailed a check for partial payment to plaintiff in Houston. *Id.*

In *J.D. Fields & Co.* and the instant case, the defendant denied the existence of a personal guaranty. In *J.D. Fields & Co.,* the court in no uncertain terms stated: "Based on this letter, we disagree with defendants' contention that there was no evidence of a personal guarantee." 21 S.W.3d at 601 n.1. The court held that the

guarantor's contacts with Texas included telephoning plaintiff's Houston office with an offer to personally guarantee defendant company's indebtedness in order to induce plaintiff to contract with defendant company; personally guaranteeing indebtedness of defendant company that was payable to Houston; and faxing a letter evidencing his personal guaranty to plaintiff's Houston office were sufficient to meet the due process minimum-contacts requirements. *Id.* at 605.

Rubinstein relies on *Valero,* in which the court detailed fairly complicated facts, noting how the guaranty in question was executed relative to a particular agreement in 2002, whereas the several different agreements at issue were executed in 2004. 702 F.Supp.2d at 710–11. The court determined that there was no evidence the guaranty acted as an inducement for the execution of the 2004 agreements and that neither the guaranty nor the 2004 agreements recited the guaranty was an inducement. *Id.* at 720. The court discussed several cases[8] wherein guarantors executed the guaranty in response to a denial of credit and emphasized no such evidence was present in *Valero,* and therefore, no basis existed to infer a guarantor would anticipate being haled into a Texas court.[9] *Id.* at 712–13.

7. As to the guarantor, the court wrote:

In this case, defendant company contracted with a Texas corporation, agreed that payments are due and payable to plaintiff's Houston office, faxed a copy of the performance bond to plaintiff's Houston office, and mailed a check to plaintiff's Houston office. Defendant guarantor called plaintiff's Houston office with an offer to personally guarantee the defendant company's indebtedness in order to induce plaintiff to contract with defendant company, personally guaranteed the indebtedness of defendant company that was payable to Houston, and *faxed a letter evidencing his personal guaranty to plaintiff's Houston office.* Although the *National Truckers, Gubitosi,* and *Marathon Metallic* cases are not controlling,

we follow the reasoning of those cases. Accordingly, we hold that defendants' (company and individual guarantor) contacts with Texas are sufficient to meet the due process minimum contacts requirements. *J.D. Fields & Co.,* 21 S.W.3d at 604–05. [Emphasis added.]

8. *See Marathon,* 653 F.2d at 922; *Goodman Co. v. A & H Supply, Inc.,* 396 F.Supp.2d 766, 772 (S.D.Tex.2005); *J.D. Fields & Co.,* 21 S.W.3d at 604; *Consol. Companies, Inc. v. Kern,* No. CIV. A.99–2704, 2000 WL 1036186, at *2 (E.D.La. July 25, 2000).

9. The court in *Valero* also noted how a defendant cannot defeat personal jurisdiction simply by refraining from physically entering the

In its discussion, the court in *Valero* stated that when a guaranty included a choice-of-law provision specifying the forum state's law and plainly contemplated that the extension of credit was predicated upon the execution of a guaranty, the guaranty was sufficient to establish specific personal jurisdiction over the guarantor. *Id.* Such language placed the guarantor on notice that the guarantor might be haled into a Texas court to enforce the guaranty. *Id.* at 715–19. The *Valero* court stated that in *Goodman* it was important to the analysis that the guarantor knew the guaranteed debts were owed to a Texas company, that many items purchased were manufactured in Texas, that the guarantor knew it was embarking on a long-term contractual relationship with a Texas company, and that there were clearly foreseeable effects in Texas.[10] *Id.*

In this case, implying the necessary facts to support the trial court's order, as we must, the evidence shows Rubinstein purchased Sterling Leather and was its sole owner and president. Rubinstein immediately contacted Lucchese in order to ensure a source of merchandise and to establish a long-term business relationship. Rubinstein knew Lucchese was an ongoing Texas corporation that manufactured boots and other western wear for resale by retailers like defendant Sterling Leather. Rubinstein executed financial documents, including a personal guaranty, to induce Lucchese's extension of credit and commenced doing business with Lucchese.

In 2005, Lucchese contacted Rubinstein about the absence of financial documents on file. The letter stressed the necessity of executing the credit application and personal guaranty "[i]n order to continue to process orders without interruption." It also emphasized that receipt of the financial documents was paramount in order to comply with Lucchese's Credit Department Policies and Procedures.

It was independently established through Lucchese's senior credit manager that Lucchese's standard business practice was to obtain a personal guaranty from the owners of corporations such as Sterling Leather *before extending credit to the corporation or entity* and that the guaranty contained a choice-of-law provision.[11]

forum state. 702 F.Supp.2d at 710. Similarly, the Supreme Court has stated that a substantial amount of business is transacted solely by mail and wire communications across state lines in modern commercial life, thus obviating the necessity for physical presence within a state in which business is conducted: "So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." *Burger King Corp.*, 471 U.S. at 476, 105 S.Ct. at 2184.

**10.** *Aloha Petroleum, Ltd.* and *Brown v. Pennington,* also relied upon by Rubinstein, are likewise distinguishable. In *Aloha,* the plaintiff did not sue to recover unpaid guaranty payments but rather to request relief unrelated to the guaranty—a declaratory judgment that plaintiff could deal and contract with substitute tenants on leased properties in Hawaii. *Aloha Petroleum, Ltd.,* 2001 WL 1568762 at *2–3. In *Brown,* no Texas resident was a party to the guaranty. *Brown,* 2015 WL 3958618 at *12. Brown was a North Carolina resident, the guaranty was governed by the laws of Rhode Island, Brown signed the guaranty in North Carolina, neither the guaranty nor the agreement in question was a contract between Brown and any Texas resident, and the plaintiff's jurisdictional allegations against Brown were framed in terms of the "totality of the circumstances" relating to issues occurring in Texas between corporate shareholders and the need for the corporation to establish a new lending relationship. *Id.* at *2, *12–13 The court concluded that Brown lacked sufficient minimum contacts to support the trial court's exercise of specific jurisdiction over him. *Id.* at 13.

**11.** The affidavit of Lucchese's senior credit manager stated:

Rubinstein replied by fax, attaching duplicates of the 2003 credit application and financial statement, as well as a current financial statement. The fax reminded Lucchese of its good payment history. The fax then expressed Rubinstein's dislike of completing *duplicate guarantees,* thus his election to send an updated financial statement. Use of the phrase "duplicate guarantees" was evidence that Rubinstein had already executed a personal guaranty and disliked the idea of completing another one. The reply fax showed Rubinstein wanted to continue doing business with Lucchese. This fax, together with the attached financial documents and Rubinstein's statement referring to a previously executed personal guaranty, induced Lucchese to continue to do business with Rubinstein. Over a span of years, merchandise was shipped from Lucchese's Texas offices to Rubinstein's offices in Pennsylvania or to Sterling Leather's clients, and Rubinstein made payment to Lucchese's office in El Paso, Texas.

We conclude that evidence of Rubinstein's execution of a personal guaranty of Sterling Leather's indebtedness to induce Lucchese to extend credit to Sterling Leather and the guaranty's provision for a choice-of-law provision (Texas) sufficiently established "minimum contacts." [12] This evidence adequately showed that the defendant purposefully availed himself of the privilege of conducting activities in the forum state and that there is a substantial connection between those contacts and the operative facts of the litigation. *See Johnson,* 285 S.W.3d at 899; *see also Nat'l Truckers,* 480 S.W.2d at 459.

## F. Fair Play and Substantial Justice

▮▮▮▮ At the outset, we note that "[o]nly in rare cases ... will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state." *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 231 (Tex.1991) (*citing Burger King,* 471 U.S. at 477–78, 105 S.Ct. at 2184–85).

In addition to Rubinstein's contacts, we conclude that the trial court's exercise of personal jurisdiction over Rubinstein comports with traditional notions of fair play and substantial justice. *See Capital Tech.*

---

It is Lucchese's standard business practice to obtain a personal guaranty from the owners of corporations (and other limited liability entities) such as Sterling Leather *before extending credit to the corporation or entity. Guaranties such as this are a condition of the extension of credit Lucchese requires* to protect its financial interests. [Emphasis added.]
The terms of the guaranty were well known to the senior credit manager and included
 the principal of the company agrees to guarantee the payment of all indebtedness incurred by the subject company in consideration for Lucchese's extension of credit to the company; the extension of credit is conditioned on the parties agreeing that the *laws and jurisdiction of the State of Texas govern the agreement.* [Emphasis added.]

**12.** We are aware of an additional instance in which courts have found specific jurisdiction over nonresident guarantors who have executed personal guarantees—where there has been substantive identity of the guarantors and the corporation whose obligation they guarantee. These cases deal with facts in which individual guarantors assume multiple roles (owner, investor, officer) in the debtor corporation, roles inextricably intertwined to the point of being inseparable and described as "substantive identity." *See Ark. Rice Growers Coop. Ass'n v. Alchemy Indus., Inc.,* 797 F.2d 565, 573 (8th Cir.1986); *Nat'l Can Corp. v. K Beverage Co.,* 674 F.2d 1134, 1138 (6th Cir.1982). As Lucchese has not advanced an argument that the substantive identity of the individual guarantor (Rubinstein) and the debtor corporation (Sterling Leather) whose obligation he guarantees is relevant in determining "minimum contacts," we do not address it.

*Info. Servs., Inc.*, 270 S.W.3d at 750. First, in evaluating the burden on Rubinstein, we conclude that there is no undue inconvenience to Rubinstein in defending this cause in Texas. Nor is there any exceptional advantage or disadvantage afforded either party by the laws of Texas. *See Gubitosi*, 545 S.W.2d at 536. Second, Texas has an interest in resolving this dispute, which involves a personal guaranty that invited Lucchese's reliance on it as a basis for extending credit to Sterling Leather. Third, plaintiff Lucchese, a Texas corporation with its principal place of business in Texas, can obtain the most convenient and efficient relief in Texas. Fourth, the efficient resolution of this controversy is promoted by adjudication in Texas because codefendant Sterling Leather is already subject to a default judgment in Texas in this very case. We perceive no particular interest implicating the shared interest of multiple states or the furtherance of fundamental substantive social policies. We hold that exercise of jurisdiction would not offend the traditional notions of fair play and substantial justice. *See J.D. Fields & Co.*, 21 S.W.3d at 604–05 (holding that contacts between guarantor and Texas were sufficient to meet due process minimum contacts requirements and did not offend traditional notions of fair play or substantial justice).

## V. CONCLUSION

We hold that Rubinstein had substantial minimum contacts with Texas and that the trial court's exercise of personal jurisdiction over him would not offend the traditional notions of fair play and substantial justice. Thus, we affirm the denial of Rubinstein's special appearance.