

# COURT OF APPEALS

## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-17-00361-CV

NORTHWEST CATTLE FEEDERS, LLC; RILEY LIVESTOCK, INC.; AND JEFF COX

APPELLANTS

V.

JASON O'CONNELL AND TOM O'CONNELL

APPELLEES

----------

FROM THE 271ST DISTRICT COURT OF JACK COUNTY
TRIAL COURT NO. 16-06-052

----------

## OPINION

----------

This appeal arises from a modern-day cattle rustling scheme. It stems, according to Jason O'Connell, from a "problem in Texas."

Appellants Northwest Cattle Feeders, LLC (Northwest); Riley Livestock, Inc. (Riley); and Jeff Cox appeal the trial court's order that granted the special appearance of appellees Jason O'Connell and Tom O'Connell and that

dismissed claims against the O'Connells for lack of personal jurisdiction. Appellants contend that the trial court's order is erroneous because the record establishes that Texas has personal jurisdiction over the O'Connells on a theory of specific jurisdiction. We affirm the trial court's order in part, reverse it in part, and remand this case to the trial court for further proceedings.

**Background**

Midwestern Cattle Marketing, LLC (Midwestern) was a Nebraska cattle brokering company; the company matched cattle producers with cattle buyers and made a profit on the difference between the buying and selling prices. Tom O'Connell was Midwestern's chief financial officer; his nephew, Jason O'Connell, was Midwestern's president.

Midwestern reached an agreement with Tony Lyon, a Texas resident, to buy and sell cattle on Midwestern's behalf. Tony kept the cattle on Lyon Farms in Perrin, Texas. He had a criminal history: in 2001, he was convicted and imprisoned for bank fraud. At some point, to facilitate Tony's buying cattle on Midwestern's behalf, Midwestern gave Tony one of its checkbooks along with a stamp of Jason's signature to endorse the checks.

In 2015, Northwest, through its managing member Jeff Cox, agreed to buy 554 steers from Midwestern. Midwestern issued an invoice that stated that Northwest was buying the steers for $798,351.19. It recited that the steers were at Lyon Farms. Riley, an investor in Northwest's business, issued Midwestern a check for the full amount of the sale, and Midwestern deposited the check into its

2

account at Points West Community Bank (Points West). Cox went to Lyon Farms and saw the 554 steers.

After Northwest bought the cattle, Cox let them graze in Perrin with the intention of retrieving them later. He understood that Tony would responsibly care for the cattle during the interim period and would be compensated for doing so. Northwest had previously bought cattle from Midwestern and, on those occasions, Cox had likewise allowed them to remain under Tony's control on Lyon Farms to graze before sending them to another location.

In June 2015, Points West called Tom and told him that Midwestern's account had been overdrawn by over $1 million. Tony had led the O'Connells to believe that Midwestern would soon receive $5 million from a check written from George Cattle Company to buy cattle from Midwestern. But when Tom went to the bank, the bank's president expressed his concern that Midwestern was the victim of a check-kiting scheme by Tony, who had control over his own account in Texas and over Midwestern's account in Nebraska. As explained by Tom,

> [Midwestern] had given [Tony] our checking account. [Tony was] writing a number of checks on our account, and we would . . . deposit it back to our account to cover those checks. . . . And everything was fine as long as . . . deposits came back into [Midwestern's] checking account.
>
> Once the music stopped, . . . there [were] no seats to be sat in, and Midwestern was left holding the bag on a $5,020,000 deposit that was no good. So it drained all of the money that we had in our account [and] left us with a $1.3 million overdraft.

3

Tom informed Jason about the overdraft, and after meeting with Tom in Nebraska, Jason told Tom that he was "going to head to Texas and see if [he could] get to the bottom of this." Jason asked Tim Correll, a business associate, to go with him to Texas to "get this figured out."

Jason drove all night to reach Texas. On the way, Correll advised Jason to inform Midwestern's customers about what was happening. While on his way to Texas, Jason called Cox, told him that there was a "problem in Texas," and asked him to come to Tony's property.

On the morning of July 1, 2015, Jason confronted Tony at his property. Tony confessed to Jason that "there [was] no money, [that] he had committed fraud, [and that] there was no George Cattle Company." Jason, with Correll's assistance, decided to seize all of the cattle on Tony's property. That day, Tony and Jason signed a handwritten document stating:

> Approx 850 head of cows, calves, bulls located in and around Perrin[,] Texas are owned by [Midwestern and] Points West . . . . Cattle are roaming on pasture land owned or leased by Lyon Farms.
>
> Lyon Farms agrees to provide care in a husbandly fashion and not move any cattle off pasture without the knowledge of Jason O'Connell or Tom O'Connell[,] owners of [Midwestern].

Tony later testified in a deposition,

> As soon as [Jason] got to Perrin he sat down . . . and wrote this up and had [me] sign it, which I would not have signed if I had known the cattle [were] not going to Brule, Nebraska.[1]

---

[1]Northwest Cattle Feeders has a Brule, Nebraska address. Midwestern has a Sidney, Nebraska address.

. . . .

. . . [Jason] knew what he was wanting to do and he just [sat] down and wrote everything out.  And he said, . . . I'm going to write this out, I need you to start gathering the cattle, bring[] them into this set of pens, we're going to have trucks, we're going to start sending all this stuff to Nebraska to Jeff's Northwest Cattle Feeders, and we're going to let it all wash itself out in Nebraska.  And I said, that's fine.

. . . .

. . . I signed off because [the cattle were] supposed to be going to Nebraska.  If he would have said, we're going to send them to here and there and yonder, I would not have signed off . . . .

For the next several days, Jason managed the seizure of all of the cattle—approximately 900 head—from Lyon Farms and moved them away from there. The 554 steers that Northwest had bought from Midwestern and that Cox had believed to be at Tony's property were not among the cattle that Midwestern seized.  While the cattle were still being seized from Lyons Farms, Cox arrived there and confronted Tony about the steers; Tony said that he had sold them to another party.  Midwestern eventually sold most of the cattle that it seized; it transferred forty-one of them to Northwest.

To repay the overdraft to Points West, the O'Connells signed a note on behalf of Midwestern and in their individual capacities.[2]  They informed Points West that they intended to use proceeds from the sales of the seized cattle to help repay the overdraft.

---

[2]The record indicates that Points West had personal guarantees from Jason and from Tom on Midwestern's checking account.

Northwest and Riley sued several parties, including Midwestern and Tony. In their original petition, among other causes of action, they pleaded for a constructive trust over proceeds from sales of cattle seized by Midwestern; alleged that Midwestern had committed fraud and had unjustly enriched itself; alleged that Midwestern had breached its contract for the sale of the steers; pleaded that upon seizing cattle from Tony, Midwestern had committed conversion; and alleged that Tony had committed fraud for which Midwestern was liable because Tony was Midwestern's agent. They further pleaded that the O'Connells, acting for Midwestern, had seized 892 cattle from Tony while representing to Cox that the "seized cattle would be used to try to 'make whole' both Cox and Midwestern Cattle." They alleged that Midwestern had delivered only 41 of the cattle to Northwest, had sold the remaining cattle, and had retained the proceeds.

Midwestern filed a special appearance, alleging that Northwest and Riley's pleading did not establish personal jurisdiction over Midwestern. After Northwest and Riley filed a response to the special appearance, the trial court denied it.

Midwestern joined Cox as a third-party defendant,[3] pleading for a declaratory judgment that Midwestern had delivered the steers under its contract with Northwest, that Cox had formed a partnership with Tony for the steers to graze on Tony's property, and that Cox was liable for any damages incurred by

---

[3]*See* Tex. R. Civ. P. 38(a).

6

Northwest for the loss of the steers. Cox answered Midwestern's claims against him and brought counterclaims under the Texas Theft Liability Act, for breach of contract, and for quantum meruit. Additionally, he pleaded that because Jason and Tom had denuded Midwestern of its corporate assets, they were individually and derivatively responsible for any liability upon Midwestern.

Northwest and Riley amended their petition multiple times. In their third amended petition, they added the O'Connells as defendants.[4] They pleaded that the O'Connells had sufficient contacts with Texas to support personal jurisdiction and that jurisdiction over them would not offend traditional notions of fair play and substantial justice. They also alleged that the claims they asserted against the O'Connells arose out of transactions that had occurred in Texas.

More specifically, with respect to the events that occurred upon the O'Connells' discovery of Tony's fraudulent check-kiting scheme, Northwest and Riley pleaded the following:

> Jeff Cox was told by representatives of [Midwestern] that "we have a problem" in Texas. . . .
>
> In several conversations that followed, Jeff Cox was led to believe by Jason O'Connell that efforts were underway to collect any

---

[4]Northwest and Riley joined together as plaintiffs in their third amended petition. Although some of the claims in the third amended petition designate only Northwest as the claimant, for simplicity, we will generally refer to the claims included in the third amended petition as "Northwest and Riley's" claims.

Northwest and Riley also sued O'Connell Cattle Company, LLC; OC Cattle Brokers, LLC; and Points West. The claims against those defendants are not at issue in this appeal.

7

cattle found in the possession of Lyon Farms in Texas, and that the cattle collected would be used to help try to make all those impacted by Tony Lyon's fraudulent scheme whole, including [Northwest]. Specifically, Jeff Cox was led to believe that [Midwestern], [Northwest,] and other victims would be acting together as a "team" in order to recover any losses from the fraudulent scheme . . . .

In reliance upon the representations by Jason O'Connell, Jeff Cox (at all times acting as [Northwest and Riley's] representative) refrained from taking any direct action to take possession of cattle found at Lyon Farms. Instead, acting consistently with what Jeff Cox was told by Jason O'Connell, [Northwest] accepted shipment of approximately 41 head of cattle taken from Lyon Farms for feeding and care. [Northwest] cared for the cattle, incurring approximately $16,193.11 in costs. After finish out, the cattle were sold . . . . The net proceeds paid were $61,268.20. In compliance with the representations of Jason O'Connell that the cattle seized were for the mutual benefit of [Northwest and Midwestern], Jeff Cox directed that the checks issued by [the buyer] be made payable to both [Northwest and Midwestern].

However, as it turns out, Jason O'Connell was not acting for the mutual benefit of [Northwest and Midwestern]. Instead, Jason O'Connell headed to Texas following a late June meeting with [Tom] and their bankers at Points West Community Bank. As a result of this meeting, Jason O'Connell [went] to Texas to confront Tony Lyon. His actions confirm that Jason O'Connell [and] Tom O'Connell . . . intended to take any cattle found in the possession of Lyon Farms for the exclusive benefit of [Midwestern].

By July 1, 2015, Jason O'Connell was in Texas . . . taking inventory of the cattle found in the possession of Lyon Farms. Jason O'Connell then drafted a document for signature by . . . Tony Lyon in order to "confirm" ownership of approximately 850 head of cattle found on Lyon Farms. . . .

. . . .

. . . After the initial shipment of the 41 head of cattle [to Northwest], the remaining cattle were dispatched to various locations in North Texas and sold over the course of July, August, September[,] and October. According to [Midwestern], approximately 585 head of the seized cattle were sold for

8

approximately $907,769.98, and this sum was applied to the overdraft . . . .

. . . .

When the fraudulent scheme unraveled, rather than take care of [Midwestern's] customers victimized by the scheme, Jason O'Connell and Tom O'Connell sought to protect [Midwestern] first, which caused further harm to victimized customers such as [Northwest]. Through fraudulent representations and other wrongful conduct, Jason O'Connell and Tom O'Connell, with the help of others, have caused further damages to [Northwest] beyond the initial harms resulting from the fraudulent conduct of [Midwestern's] agent – Tony Lyon.

From these facts, Northwest and Riley pleaded a fraud claim against Jason, alleging that he had falsely represented that "[Northwest and Riley] would receive a share of the proceeds from the cattle seized from Lyon Farms . . . and that [Midwestern] and [Jason] would act in the joint interest of [Midwestern] and [Northwest] as a 'team' with respect to [recovering losses with] the seized cattle." Northwest and Riley also pleaded a claim of fraud by nondisclosure against Jason and Tom, alleging that they had a duty to disclose facts related to the seizure of cattle from Lyon Farms, that they did not disclose the facts, and that their failure to disclose "induced [Northwest] to refrain from taking any action with respect to the cattle in the possession of Lyon Farms so that" Midwestern, Jason, Tom, and Points West "would receive the exclusive benefit of proceeds from selling the seized cattle."

Northwest and Riley also pleaded that Tom was liable for such fraud by nondisclosure because he retained benefits of the fraud and therefore ratified it.

9

Further, they pleaded a claim of civil conspiracy to commit fraud against Jason and Tom, a claim of negligent undertaking against Jason, a claim of breach of fiduciary duty against Jason and of knowing participation in a breach of fiduciary duty against Tom, and claims of interference with prospective business relations and of money had and received against Jason and Tom. Finally, like Cox, Northwest and Riley pleaded that Jason and Tom were derivatively responsible for Midwestern's liabilities because they had denuded Midwestern of its corporate assets.

The O'Connells filed a special appearance, arguing that all of appellants' claims against them should be dismissed for lack of personal jurisdiction. The O'Connells argued that they were out-of-state residents "with virtually no contacts with the State of Texas." They asserted their sole contact with Texas had been through Midwestern and that they had never acted in Texas in their individual capacities.

Supporting their special appearance, the O'Connells each filed sworn statements. Jason swore that he has never resided in Texas and has not owned property here. He stated that any business that he had conducted in Texas, including the seizure of cattle from Lyon Farms, was as a representative of Midwestern. Finally, he swore that travelling to Texas to defend against appellants' claims would be burdensome to his business responsibilities. Tom swore to similar facts.

After considering the parties' written and oral arguments, the trial court granted the O'Connells' special appearance and dismissed appellants' claims against them for lack of personal jurisdiction. The court made the following findings and conclusions:

## FINDINGS OF FACT

1. Jason . . . was at all pertinent times a resident of Colorado or Arizona.

2. Any business Jason . . . conducted in Texas within the last seven years has been conducted as a representative of [Midwestern].

3. Jason . . . has not, on his own behalf, conducted business or had contact with [Tony], . . . [Northwest], [Riley], or . . . Cox in Texas.

4. Tom . . . is a Nebraska resident.

5. Any business Tom . . . conducted in Texas within the last seven years has been conducted as a representative of [Midwestern].

6. Tom . . . has not, on his own behalf, conducted business or had contact with [Tony], . . . [Northwest], [Riley], or . . . Cox in Texas.

. . . .

## CONCLUSIONS OF LAW

11. [Appellants] did not allege or prove that general jurisdiction exists for claims asserted against [the O'Connells].

12. [Appellants] failed to establish that the Court has specific jurisdiction over Jason . . . because: (1) Jason . . . has not committed a tort in Texas in his individual capacity; and (2) the causes of action asserted by [appellants] do not arise from, and are not substantially related to, purposeful contacts made by Jason . . . in his individual capacity with Texas.

11

13. [Appellants] failed to establish that the Court has specific jurisdiction over Tom . . . because: (1) Tom . . . has not committed a tort in Texas in his individual capacity; and (2) the causes of action asserted by [appellants] do not arise from, and are not substantially related to, purposeful contacts made by Tom . . . in his individual capacity with Texas.

Appellants brought this interlocutory appeal.[5]

## Personal Jurisdiction

Appellants raise four issues on appeal, principally arguing that on a theory of specific jurisdiction, the record sufficiently establishes the requisites of personal jurisdiction over the O'Connells.[6]

**The constitutional contours of personal jurisdiction**

The concept of personal jurisdiction flows from the Due Process Clause of the Fourteenth Amendment and refers to a court's power to bind a nonresident party to a judgment. *CSR Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex. 1996); *see* U.S. Const. amend. XIV, § 1. The personal-jurisdiction requirement recognizes an individual liberty interest in that it protects a defendant against the burdens of litigating in a distant forum. *See Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 n.10, 102 S. Ct. 2099, 2104 n.10 (1982).

The Texas long-arm statute, which sets the limits of personal jurisdiction in this state, reaches as far as due process allows. *CSR Ltd.*, 925 S.W.2d at 594;

---

[5]*See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(7) (West Supp. 2017).

[6]Appellants do not argue that the O'Connells are subject to the trial court's jurisdiction on a theory of general jurisdiction.

12

*see* Tex. Civ. Prac. & Rem. Code Ann. § 17.042 (West 2015); *see also Zinc Nacional, S.A. v. Bouche Trucking, Inc.*, 308 S.W.3d 395, 397 (Tex. 2010) (recognizing that section 17.042's broad language extends jurisdiction to the limits of due process). Accordingly, a Texas court may exercise personal jurisdiction over a nonresident defendant if the defendant has minimum contacts with Texas and the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *M & F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co.*, 512 S.W.3d 878, 885 (Tex. 2017); *Rubinstein v. Lucchese, Inc.*, 497 S.W.3d 615, 623 (Tex. App.—Fort Worth 2016, no pet.) (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945)).

The touchstone of a minimum-contacts analysis is purposeful availment: the defendant must purposefully avail itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. *Cornerstone Healthcare Grp. Holding, Inc. v. Nautic Mgmt. VI*, 493 S.W.3d 65, 70 (Tex. 2016). Three principles govern our consideration of a defendant's purposeful availment: (1) only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or third person; (2) the defendant's acts must be purposeful and not random or fortuitous; and (3) the defendant must seek some benefit, advantage, or profit by availing itself of the jurisdiction such that it impliedly consents to suit there. *M & F Worldwide Corp.*, 512 S.W.3d at 886.

13

A plaintiff may establish a defendant's "minimum contacts" on bases of general jurisdiction or specific jurisdiction. *Rubinstein*, 497 S.W.3d at 623. General jurisdiction over a nonresident defendant exists when the defendant's affiliations with the forum state are so continuous and systematic as to render it "essentially at home" there. *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 72 (Tex. 2016). General jurisdiction involves a court's ability to exercise jurisdiction over a nonresident defendant based on any claim, including claims unrelated to the defendant's contacts with the state. *M & F Worldwide Corp.*, 512 S.W.3d at 885.

Specific jurisdiction, on the other hand, exists when the defendant's activities in the forum state, even if isolated or sporadic, beget the liability sued on; it arises when the plaintiff's claims link to the defendant's contacts with the forum. *Searcy*, 496 S.W.3d at 67; *TV Azteca v. Ruiz*, 490 S.W.3d 29, 37 (Tex. 2016), *cert. denied*, 137 S. Ct. 2290 (2017). In a specific-jurisdiction analysis, we consider "the relationship between the defendant, the forum state, and the litigation"; for jurisdiction to attach, the "defendant's contacts with the forum state [must be] substantially connected to the alleged operative facts of the case." *Searcy*, 496 S.W.3d at 67, 70; *see also Guidry v. U.S. Tobacco Co.*, 188 F.3d 619, 628 (5th Cir. 1999) ("When a nonresident defendant commits a tort within the state, . . . that tortious conduct amounts to sufficient minimum contacts with the state by the defendant to constitutionally permit courts within that state . . . to exercise personal adjudicative jurisdiction over the tortfeasor and the causes of actions arising from its offenses or quasi-offenses."). A plaintiff must establish

14

specific jurisdiction on a claim-by-claim basis unless all the asserted claims arise from the same forum contacts. *M & F Worldwide Corp.*, 512 S.W.3d at 886.

Once a plaintiff establishes a nonresident defendant's "minimum contacts" through general jurisdiction or specific jurisdiction, it is a "rare case when the exercise of jurisdiction over that defendant does not comport with traditional notions of fair play and substantial justice." *MasterGuard L.P. v. Eco Techs. Int'l LLC*, 441 S.W.3d 367, 381 (Tex. App.—Dallas 2013, no pet.). To show that jurisdiction does not comport with fair play and substantial justice in such a case, the defendant must present a compelling case that the presence of some consideration would render jurisdiction unreasonable. *Guardian Royal Exch. Assur. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 231 (Tex. 1991).

**The parties' burdens and our standard of review**

The plaintiff and the defendant have shifting burdens in a challenge to personal jurisdiction. *Kelly v. Gen. Interior Constr.*, 301 S.W.3d 653, 658 (Tex. 2010); *see* Tex. R. Civ. P. 120a. The plaintiff bears the initial burden of pleading sufficient facts to establish jurisdiction. *See Rubinstein*, 497 S.W.3d at 623. The specially-appearing defendant must then negate all bases of personal jurisdiction that the plaintiff has pleaded. *Id.* The defendant may do so by presenting evidence that it has no contacts with Texas or by showing that even if the facts alleged by the plaintiff are true, they are legally insufficient to establish the

15

propriety of jurisdiction over the defendant.[7]  *See OZO Capital, Inc. v. Syphers*, No. 02-17-00131-CV, 2018 WL 1531444, at *4 (Tex. App.—Fort Worth Mar. 29, 2018, no pet. h.) (mem. op.).   The plaintiff may respond to any evidence presented by the defendant by presenting evidence that affirms its jurisdictional allegations.  *Id.* (citing *Kelly*, 301 S.W.3d at 659).

"Because the plaintiff defines the scope and nature of the lawsuit, the defendant's corresponding burden to negate jurisdiction is tied to the allegations in the plaintiff's pleading."  *Kelly*, 301 S.W.3d at 658.  Whether a trial court has personal jurisdiction over a defendant is a question of law that we review de novo.  *M & F Worldwide Corp.*, 512 S.W.3d at 885.

**Northwest and Riley's direct claims against Jason – minimum contacts**

Appellants argue in their first and second issues that the trial court has specific jurisdiction over Jason because their claims against him "arise out of his contacts directed at Texas—the seizure of the cattle from Lyon Farms and the misrepresentations to" Cox.  In Northwest and Riley's third amended petition— their live pleading—they segregate their claims related to the 554 steers and their claims related to the seized cattle.  Their direct claims against Jason relate only

---

[7]In this appeal, we construe the parties' briefs as principally arguing about the jurisdictional significance of facts, not as arguing about any resolution by the trial court of conflicting, disputed facts.  The record does not indicate that the trial court based its decision on the resolution of conflicting facts, so we will conduct a matter-of-law review of the facts as pleaded and proved.  *See Knight Corp. v. Knight*, 367 S.W.3d 715, 724–25 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

16

to the seized cattle.[8]  Although those claims have varying legal bases, the essential factual allegations for the claims are the same:  Jason knew that Northwest and Midwestern were each victims of Tony's fraud; he represented that Midwestern would seize the cattle for the benefit of Northwest and Midwestern with the purpose of helping them both recover from that fraud; contrary to the representation, he planned to use proceeds from the sale of the seized cattle only for remediating Midwestern's losses and for repaying the overdraft from Points West; he induced Tony to execute a document to give Midwestern all rights to the cattle; he intended for Northwest to rely on his representation by refraining to take its own actions to recover its losses, and Northwest did so; and his representation was false because Midwestern did not share proceeds derived from sales of the seized cattle.

Supporting these allegations, Northwest and Riley presented circumstantial evidence indicating a shared understanding in Texas between Cox, Tony, Jason, and Tim Correll that Northwest and Midwestern would work together to manage the seized cattle and to share proceeds from sales. Northwest also presented evidence that Cox acted according to, and therefore relied upon, that understanding.

---

[8]Thus, we reject Jason's argument on appeal that in "this case, the subject matter of the litigation is [Midwestern's] sale of 554 steers to Northwest."  We also reject Jason's unexplained assertion that Northwest and Riley's claims against him cannot be "stand alone claims."

17

As explained above, Tony testified that when he signed the document that Jason presented to him after Jason arrived in Perrin, he understood that the cattle would be moved to Northwest's property in Nebraska. Cox testified that when he arrived at Lyon Farms after the exposure of Tony's fraud, Tony "said . . . he was going to . . . turn all of his inventory over to us, which would be Midwestern and myself, and you know, just go from there and . . . try to work this out." Cox also testified, "Jason and I and [Tim Correll] talked that we would move all the cattle to Nebraska to Northwest." He later testified,

> Jason and Tim . . . who represent Midwestern . . . were here a few days prior to me in July [2015]. . . . [W]e were going to take [the cattle] to Nebraska, just get them out of here. Well, that wasn't going to work. It's too hot, different kind of cattle, it wasn't going to work. They sent 37 bred cows and 4 open cows to my feed yard. In turn, we kept them there, fed them, calved out what we could. What these reflect are the sales of [those] cattle, the cows and calves and then the opens that didn't have calves and so these checks, when I took them to the sale barn, we have brand laws in our state that whose cattle are these? *Well, I have a vested interest in them and so does Midwestern, so I had the checks made out to Northwest and Midwestern and I've retained them in my possession.*
>
> . . . .
>
> . . . I got out and talked to Tim and said, you know, where are these cattle, what are you guys finding? You know, they were around there, had been there for a couple days, three or four days, and they were -- we had spoke[n] every day, Jason and Tony and -- not Tony, but Tim and I had spoke[n] every day while they were down there trying to find what they could. I talked to Tim about where they were moving them, . . . *what we were going to do with them as a group.* . . . You know, we talked on the phone a couple days previous *about our plan of action* to get them . . . off of the property and -- not that Texas is a bad place, but we wanted them in Nebraska, just to get them out of here. [Emphases added.]

18

The pleadings and evidence, considered together, establish that the shared essence of Northwest and Riley's direct claims[9] against Jason is that he drove to Texas, made (by himself or through his agent Tim Correll)[10] representations in Texas about cattle in Texas, and seized the cattle in Texas with the intent of acting contrary to the representations.[11] Accordingly, we hold that the pleadings and evidence establish sufficient minimum contacts between Jason and Texas for the exercise of personal jurisdiction on a theory of specific jurisdiction, as the claims against Jason arise out his contacts with this state. *See Guidry*, 188 F.3d at 628; *Searcy*, 496 S.W.3d at 67; *see also Trois v. Apple Tree Auction Ctr.*, 882 F.3d 485, 487–88, 490–91 (5th Cir. 2018) (recognizing the existence of specific jurisdiction over an Ohio defendant for a fraud claim when the defendant allegedly made misrepresentations through phone calls to the

---

[9]We discuss appellants' derivative denuding claims against Jason below.

[10]"[T]he actions of an agent may establish minimum contacts over a principal." *McFadin v. Gerber*, 587 F.3d 753, 761 (5th Cir. 2009), *cert. denied*, 562 U.S. 827 (2010). Further, we note that fraud may occur when a defendant transmits a misrepresentation to a plaintiff through a third party as long as the defendant intended for the misrepresentation to reach the plaintiff and intended to induce the plaintiff's reliance. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 578 (Tex. 2001).

[11]We recognize, as the O'Connells argue, that in a February 2016 deposition, Cox testified that he was not accusing the O'Connells of making false representations. In Northwest and Riley's response to the O'Connells' special appearance, they alleged that discovery in their suit against Midwestern had revealed "previously undisclosed actions of [the O'Connells] related to the seizure of the cattle." Considering Cox's statement in his deposition cumulatively with the remaining evidence in the record, we conclude that the statement does not negate the trial court's specific jurisdiction over Jason.

19

plaintiff, who lived in Texas); *Patel v. Pate*, No. 02-16-00313-CV, 2017 WL 2871684, at *5 (Tex. App.—Fort Worth July 6, 2017, no pet.) (mem. op.) ("A nonresident who, while physically present in the State of Texas, either makes statements alleged to be fraudulent or fails to disclose material information that he is under a duty to disclose is subject to specific jurisdiction in Texas in a subsequent action arising from the statement or nondisclosure.").

Citing *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 573 (Tex. 2007), Jason argues that his alleged misrepresentation cannot support specific jurisdiction because it is "ancillary" to the litigation. We cannot agree that this case is analogous to *Moki Mac*, in which the supreme court held that Texas's connection to litigation was too attenuated when the litigation would principally focus on an alleged wrongful death that occurred in Arizona after the decedent's mother read representations from a company's brochures and websites while in Texas. *See id.* at 573, 585–88. Here, the litigation by Northwest and Riley against Jason will principally focus on his alleged misrepresentation, an event that occurred in Texas.

The trial court did not find that Jason did not have sufficient minimum contacts with Texas in a literal sense; rather, the court appeared to predicate its ruling on its finding that he made any such contacts only as Midwestern's representative, not in his individual capacity. In a hearing on the O'Connells' special appearance, they relied, in part, on the fiduciary shield doctrine to contend they could not be individually liable for acts on Midwestern's behalf.

20

Appellants, however, argue that an agent who knowingly participates in a tortious or fraudulent act may be held individually liable to third persons even though he performed the act as an agent of the corporation. This is the law in Texas. *See Nwokedi v. Unlimited Restoration Specialists, Inc.*, 428 S.W.3d 191, 201 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). And although the fiduciary shield doctrine protects corporate officers in some circumstances from being subject to jurisdiction on a general jurisdiction theory, it "does not protect a corporate officer from specific personal jurisdiction as to intentional torts or fraudulent acts for which he may be held individually liable." *Steamboat Capital Mgmt. v. Lowry*, No. 01-16-00956-CV, 2017 WL 5623414, at *10 (Tex. App.—Houston [1st Dist.] Nov. 21, 2017, no pet.) (mem. op.); *see Trois*, 882 F.3d at 492 (holding that the "fact that the court ha[d] personal jurisdiction over [the individual defendant was] an issue separate from his personal liability for the conduct of the corporation, which if relevant, would be more appropriately determined on the merits at a later stage of th[e] litigation"); *Nev. Nat'l Advert., Inc. v. Silverleaf Resorts, Inc.*, No. 05-16-00694-CV, 2017 WL 655949, at *11 (Tex. App.—Dallas Feb. 17, 2017, no pet.) (mem. op.) (holding that the "fiduciary shield doctrine [did] not protect [an individual defendant] from the exercise of specific jurisdiction, even if all of his contacts with Texas were performed in a corporate capacity"); *Esse v. BP Am. Prod. Co.*, No. 01-04-00567-CV, 2006 WL 1227724, at *8 (Tex. App.—Houston [1st Dist.] May 4, 2006, no pet.) (mem. op.) (explaining that "Texas courts applying the fiduciary shield doctrine have expressly limited its

21

application to attempts to exercise general jurisdiction over a nonresident defendant"). Therefore, we reject the trial court's conclusion that it did not have jurisdiction over Jason because he did not act in his individual capacity in Texas.

In the part of Jason's briefing in which he discusses minimum contacts, he challenges Northwest's claims of money had and received, tortious interference with prospective business relations, and negligent undertaking on grounds that Northwest did not "plead sufficient facts to impose liability" for those claims. He also argues that Northwest's fraud by nondisclosure claim fails because he did not have a duty to disclose information to Northwest. In their reply brief, appellants contend that these "arguments are better suited for summary judgment."

We "do not address the merits of the tort claims in reviewing the special appearance; rather, we . . . analyze the quality and nature of . . . contacts in light of [the] pleaded tort claims." *OZO Capital*, 2018 WL 1531444, at *6 n.9; *Richardson v. MH Outdoor Media, LLC*, No. 14-16-00041-CV, 2016 WL 4921104, at *8 (Tex. App.—Houston [14th Dist.] Sept. 15, 2016, no pet.) (mem. op.) (declining to address an argument that there was no duty to disclose with respect to a fraud claim because the argument was "not appropriate at the special-appearance stage") (citing *Dresser-Rand Grp. v. Centauro Capital, S.L.U.*, 448 S.W.3d 577, 584 (Tex. App.—Houston [14th Dist.] 2014, no pet.)); *see also Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 790–91 (Tex. 2005) (explaining that a nonresident should not be able to "defeat

22

jurisdiction by proving there was no tort" and that the relevant question is "contacts" rather than "culpability"); *In re Cho*, No. 02-17-00254-CV, 2017 WL 3911002, at \*2 (Tex. App.—Fort Worth Sept. 7, 2017, orig. proceeding) (mem. op.) ("A court should not reach the merits of the case when deciding a special appearance."). We decline to address Jason's merit-based challenges to the claims against him.

For all of these reasons, we conclude that on a theory of specific jurisdiction, Jason has sufficient minimum contacts with this state for our courts to exercise jurisdiction over him with regard to Northwest and Riley's direct claims.[12] *See M & F Worldwide Corp.*, 512 S.W.3d at 885; *Searcy*, 496 S.W.3d at 67. To that extent, we sustain appellants' first and second issues, which relate to the trial court's jurisdiction over Jason on the basis of his minimum contacts.

**Northwest and Riley's direct claims against Jason – fair play and substantial justice**

The trial court did not explicitly find whether jurisdiction over Jason would comport with notions of fair play and substantial justice, the second part of our jurisdictional inquiry.[13] *See M & F Worldwide Corp.*, 512 S.W.3d at 885;

---

[12]When we hold that a trial court has jurisdiction over a nonresident defendant on the basis of specific jurisdiction, we need not analyze whether personal jurisdiction exists on a theory of general jurisdiction. *See Spir Star AG v. Kimich*, 310 S.W.3d 868, 872 (Tex. 2010).

[13]In part of their fourth issue, appellants contend that the trial court erred by failing to make findings and conclusions concerning whether jurisdiction over the O'Connells comports with fair play and substantial justice. We decline to address that part of appellants' fourth issue because its resolution does not affect

23

*Rubinstein*, 497 S.W.3d at 623. As explained above, when a nonresident has sufficient minimum contacts for a forum state to exercise jurisdiction, it usually follows that jurisdiction does not offend notions of fair play and substantial justice. *See MasterGuard L.P.*, 441 S.W.3d at 381. In analyzing whether jurisdiction comports with fair play and substantial justice, we consider, among other factors, the burden on the defendant, the interests of the forum in adjudicating the dispute, and the plaintiff's interest in obtaining convenient and effective relief. *TV Azteca*, 490 S.W.3d at 55.

In part of their fourth issue, appellants contend that because the claims by Northwest and Riley against Midwestern will be heard in Texas, "it would be more efficient to adjudicate the entire case in the same place." In accordance with that argument, our supreme court has noted that adjudicating a plaintiff's claims "against all defendants in one proceeding provides the most efficient means for resolving [the] disputes." *Id.* at 56; *see Spir Star AG*, 310 S.W.3d at 879 ("[I]t would be more efficient to adjudicate the entire case in the same place."). Thus, we conclude that Northwest and Riley's interests in adjudicating their claims against all of the defendants in the same forum weigh in favor of Texas's jurisdiction over Jason. Further, although Jason swore in the trial court that appearing in Texas to defend against this suit would be burdensome to his

---

our disposition of the appeal. *See* Tex. R. App. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal.").

24

business responsibilities, we note that Midwestern litigated its own suit against Tony through a jury trial in Texas and that Jason testified at that trial, indicating that the burden upon him to participate in litigation in Texas is not onerous.[14]

Jason argues that litigation in Nebraska would be more sensible for the parties, but our review of his arguments and of the record reveals no compelling reason why jurisdiction over Northwest and Riley's claims against him in Texas is unreasonable. *See Guardian Royal Exch. Assur.*, 815 S.W.2d at 231. The fact that the claims might be fairly litigated in another forum does not mean that jurisdiction is inappropriate in this one. *See Conner v. ContiCarriers & Terminals, Inc.*, 944 S.W.2d 405, 420 (Tex. App.—Houston [14th Dist.] 1997, no writ) (plurality op.) (explaining that "inconvenience is not sufficient to overcome jurisdiction"); *see also Sarieddine v. Moussa*, 820 S.W.2d 837, 844 (Tex. App.—Dallas 1991, writ denied) (stating, in the context of discussing the doctrine of forum non conveniens, that a trial court "may not dismiss simply because it determines that another forum is superior to that chosen by the plaintiff").

For these reasons, we conclude that Texas's jurisdiction over Jason comports with notions of fair play and substantial justice.[15] *See Guardian Royal*

---

[14]Midwestern obtained a money judgment against Tony.

[15]Under the same rationale, we conclude that as to appellants' derivative claims against Tom that are based on his alleged denuding of Midwestern's corporate assets, jurisdiction over him comports with notions of fair play and substantial justice. We will discuss the issue of minimum contacts for those claims below.

25

*Exch. Assur.*, 815 S.W.2d at 231.  To that extent, we sustain Northwest's fourth issue.

**Northwest and Riley's direct claims against Tom – no minimum contacts**

In appellants' third issue, they contend that the trial court erred by granting Tom's special appearance.  They assert in briefing that the trial court has specific jurisdiction over Tom because he participated (along with Jason and Points West) in a plan to seize cattle from Lyon Farms to repay the $1.3 million overdraft and personally benefited from the seizure of the cattle.  They contend in their brief that to "negate specific jurisdiction, [Tom] must show that [appellants'] claims do not arise out of the seizure of the cattle."

As conceded by appellants in oral argument, however, their claims with respect to the seized cattle cannot substantially arise from their mere seizure unconnected with Jason's alleged misrepresentation about them.  *See Moki Mac*, 221 S.W.3d at 585 ("[F]or a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, there must be a substantial connection between those contacts and the operative facts of the litigation.").  Rather, as appellants have acknowledged, their direct claims against the O'Connells must principally arise from Jason's alleged misrepresentation relating to the seized cattle and Cox's alleged reliance, to his detriment, upon the misrepresentation.

In oral argument in this court, appellants' counsel conceded that absent the alleged misrepresentation, Northwest had "no more and no less of a right to [the cattle] that were on [Tony's] property . . . than [Midwestern] did. . . .  *But by*

26

*defrauding us, they were able to move themselves ahead of the line . . . .*" [Emphasis added.] Counsel further acknowledged that absent Jason's alleged misrepresentation, a claim could not arise from "two independent creditors competing to get the same assets." Counsel also asserted that the dual operative facts of appellants' claims relating to the seized cattle were their seizure and Jason's misrepresentation about them. And in their reply brief, appellants acknowledge that their direct claims against Jason "arise from [his] trip to Texas to seize and sell cattle *while representing to Northwest that any cattle found on Lyon Farms . . . would be used for the benefit of all the victims of the fraudulent cattle scheme,*" and their direct claims against Tom require his direction of or participation in a tortious or fraudulent act. [Emphasis added.]

Appellants' arguments on appeal do not explain Tom's factual connection to any misrepresentation. Although Northwest and Riley pleaded in the trial court in a conclusory fashion that Tom could be liable for claims that required his knowledge or participation in the alleged misrepresentation,[16] they did not plead

---

[16]Northwest and Riley pleaded a fraud by nondisclosure claim against Tom, but they predicated Tom's alleged duty to disclose on a "special relationship" formed through Jason's alleged misrepresentation or a false impression that flowed from the alleged misrepresentation. Similarly, Northwest and Riley pleaded that Tom was liable for engaging in a conspiracy but predicated the conspiracy on the conspirators' intent to "induce [Northwest] to refrain from taking any action to recover losses from cattle found on Lyon Farms."

Northwest and Riley also pleaded that Tom could be liable for aiding and abetting fraud, for ratifying fraud, and for knowingly participating in Jason's breach of a fiduciary duty, but those theories of liability require Tom's knowledge

27

facts specifying how Tom encouraged, knew about, or was involved in the alleged misrepresentation in Texas that Jason made to Cox about the seized cattle.[17]  *Cf. Abdulhussein v. Rezz Invs. Ltd.*, No. 01-17-00096-CV, 2018 WL 769306, at *1 (Tex. App.—Houston [1st Dist.] Feb. 8, 2018, no pet.) ("[T]he plaintiff bears the initial burden to plead factual allegations sufficient to confer personal jurisdiction over the defendant . . . ."); *Haferkamp v. Grunstein*, No. 11-10-00194-CV, 2012 WL 1632009, at *6 (Tex. App.—Eastland May 10, 2012, pet. denied) (mem. op.) (holding that a plaintiff did not plead sufficient jurisdictional allegations when the plaintiff's petition was vague and conclusory).  Further, our review of the evidence presented by the parties does not indicate Tom's role in Jason's alleged misrepresentation.

Thus, we conclude that with regard to their direct claims against Tom, Northwest and Riley did not meet their initial burden of pleading sufficient

---

of the alleged misrepresentation.  *See W. Fork Advisors, LLC v. SunGard Consulting Servs.*, 437 S.W.3d 917, 921 (Tex. App.—Dallas 2014, pet. denied) (explaining that aiding and abetting claims "require the actor, with unlawful intent, to give substantial assistance and encouragement to a wrongdoer in a tortious act"); *FDIC/Manager Fund v. Larsen*, No. 05-88-00137-CV, 1993 WL 37380, at *7 & n.6 (Tex. App.—Dallas Feb. 11, 1993, writ denied) (op. on remand, not designated for publication) (discussing ratification).  Finally, Northwest pleaded claims of interference with prospective business relations and of money had and received against Tom, but Northwest based those claims on Jason's alleged unlawful misrepresentations.

[17]In the "Factual Background" portion of their third amended petition, Northwest and Riley pleaded that Tom "intended to take any cattle found in the possession of Lyon Farms for the exclusive benefit of Midwestern Cattle"  but did not plead how Tom was involved in Jason's alleged misrepresentation to Cox.

allegations to bring Tom within the provisions of the Texas long-arm statute for specific personal jurisdiction. *See Rubinstein*, 497 S.W.3d at 623. Even if the petition alleges and the evidence shows, as appellants assert, that Tom has some connection with Texas because he participated in a plan for Jason to drive to Texas to seize cattle, the mere plan to seize and the actual seizure of the cattle cannot support specific jurisdiction against Tom because those acts do not comprise the operative facts of Northwest and Riley's direct claims against him. *See Moki Mac*, 221 S.W.3d at 585. We overrule appellants' third issue except to the extent of appellants' derivative denuding claims against Tom.

**Denuding claims against Jason and Tom**

Finally, as we explained above, after Midwestern brought a third-party claim against Cox, Cox brought a counterclaim against Midwestern that sought money for services that Cox pleaded he had rendered for Midwestern. In the same pleading, Cox pleaded that Jason and Tom had denuded Midwestern of its corporate assets, and he pleaded that Jason and Tom were liable for Midwestern's obligations to him under a denuding theory. More specifically, Cox pleaded that the O'Connells had transferred Midwestern's corporate assets to other business ventures that they owned. Cox also pleaded that the new business ventures "continue[d] to operate in the same manner and, in fact, in the same facility . . . as Midwestern . . . [had] operated. The O'Connells . . . simply changed the names of the operation in an effort to avoid obligations to creditors of Midwestern . . . ." Similarly, Northwest and Riley relied on a denuding theory

29

in their live pleading to assert that the O'Connells should be liable for Midwestern's debts and obligations. On appeal, the O'Connells contend that no jurisdiction exists with respect to these denuding claims only because if "denuding occurred[,] . . . there is no suggestion it happened in Texas or caused a harm in Texas."[18]

The "denuding" theory allows for a defendant's personal liability for the obligations of a corporation when the defendant has stripped the corporation of its assets that the corporation could have used to pay a creditor or a claimant. *See World Broad. Sys., Inc. v. Bass*, 328 S.W.2d 863, 866 (Tex. 1959); *Francis v. Beaudry*, 733 S.W.2d 331, 335 (Tex. App.—Dallas 1987, writ ref'd n.r.e.). Under the denuding theory, liability on the individual defendant is derivative of the corporation's liability for some obligation. *See Francis*, 733 S.W.2d at 335; *Fagan v. La Gloria Oil & Gas Co.*, 494 S.W.2d 624, 632 (Tex. Civ. App.—Houston [14th Dist.] 1973, no writ).

---

[18]We emphasize that on appeal, the O'Connells contest jurisdiction over appellants' denuding claims against them based only on pleadings; they do not argue that the record contains insufficient evidence of denuding or provide any analysis of the evidence in the record related to denuding. Similarly, we cannot locate any part of the record in which the O'Connells contested jurisdiction over appellants' denuding claims on the basis that appellants did not provide sufficient evidence to prove that denuding occurred. Without the benefit of briefing from the O'Connells, we decline to undertake our own review of the lengthy record for evidence related to denuding. *See* Tex. R. App. P. 38.1(i) (stating that a brief must contain "a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record").

30

The O'Connells do not argue in this appeal that Midwestern does not have sufficient jurisdictional contacts with Texas to establish personal jurisdiction. Because the O'Connells' liability under a denuding theory, if any, derives from Midwestern's liability, we conclude that Midwestern's jurisdictional contacts with Texas may be imputed to them. *See Karaa v. Aramoonie*, No. 05-17-00571-CV, 2018 WL 1373958, at *4 (Tex. App.—Dallas Mar. 19, 2018, no pet.) (mem. op.) (explaining that under the alter ego theory of corporate owner liability, the corporation's jurisdictional contacts may be imputed to the owner); *Davey v. Shaw*, 225 S.W.3d 843, 854 (Tex. App.—Dallas 2007, no pet.) (stating the same); *see also Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 653 (5th Cir. 2002) ("[F]ederal courts have consistently acknowledged that it is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court."). And because we have already held that jurisdiction over Jason and Tom does not offend notions of fair play and substantial justice, we conclude that the trial court erred to the extent that it dismissed appellants' denuding claims against Jason and Tom. We sustain appellants' first through fourth issues to that extent.

31

**Conclusion**

Having sustained appellants' first and second issues and dispositive portions of its fourth issue, we hold that the trial court erred by concluding that it does not have jurisdiction over Jason. We reverse the trial court's "Order Granting Newly Added Defendants' Special Appearance" to the extent that the order grants Jason's special appearance and dismisses appellants' claims against him. Having overruled appellants' third issue in part, we hold that the trial court did not err by concluding that it does not have jurisdiction over Tom for Northwest and Riley's direct claims against him. We affirm the trial court's order to the extent that it dismisses Northwest and Riley's direct claims against Tom: fraud by nondisclosure, civil conspiracy, knowing participation in a breach of fiduciary duty, interference with prospective business relations, and money had and received.

But having sustained appellants' third issue in part and having held that jurisdiction over Tom does not offend traditional notions of fair play and substantial justice as argued by appellants in their fourth issue to the extent of appellants' denuding claim against him, we reverse the trial court's order to the extent that it dismisses appellants' denuding claim against Tom. We remand this case to the trial court for further proceedings consistent with this opinion.[19]

---

[19]We emphasize that we do not intend for any part of our analysis to express an opinion on the merits of the causes of action at issue. *See Rubinstein*, 497 S.W.3d at 624 ("The issue in question is whether the trial court can exercise personal jurisdiction over Rubinstein given his contacts with Texas,

/s/ Wade Birdwell
WADE BIRDWELL
JUSTICE

PANEL:  WALKER, MEIER, and BIRDWELL, JJ.

DELIVERED:  June 14, 2018

---

not whether Lucchese has a viable cause of action against him.  Personal jurisdiction may exist even if the plaintiff ultimately loses his suit or has less than a certain claim.").