2025 Tex. Bus. 53



THE BUSINESS COURT OF TEXAS
EIGHTH DIVISION

SLANT OPERATING, LLC, and SLANT WTX HOLDINGS II, LLC, §§§

*Plaintiffs,* §§

v. §     Cause No. 24-BC08A-0002

OCTANE ENERGY OPERATING, LLC, §§

*Defendant.* §§

---

## OPINION AND ORDER

---

### *Syllabus**

    This opinion addresses competing motions for summary judgment regarding liability for Defendant's alleged breach of a reciprocal waiver agreement. More specifically, the Court considers whether there are genuine issues of material fact concerning the definiteness of the agreement's essential terms and the parties' mutual assent to those terms. The Court concludes no such fact issues exist to preclude summary judgment for Plaintiff. Accordingly, the Court grants Plaintiff's motion and denies Defendant's motion.

---

    * The syllabus was created by court staff and is provided for the convenience of the reader. It is not part of the Court's opinion, does not constitute the Court's official description or statement, and should not be relied upon as legal authority.

**OPINION**

Before the Court are two competing motions for summary judgment:

(1) Plaintiff Slant Operating, LLC ("Slant Operating")'s Motion for Partial Summary Judgment, filed March 19, 2025 ("Slant Operating's Motion");[1] and

(2) Octane Energy Operating, LLC ("Octane")'s Motion for Summary Judgment filed June 17, 2025 ("Octane's Motion").

¶ 1    The parties each filed responsive briefing. After considering the pleadings, the briefings, evidence, and the oral arguments presented by counsel, the Court concludes Slant Operating is entitled to partial summary judgment on liability. Accordingly, Slant Operating's Motion is **GRANTED** and Octane's Motion is **DENIED**.

## I.    BACKGROUND

### A.    Slant Operating and Octane enter into a reciprocal waiver agreement.

¶ 2    Slant Operating and Octane are entities involved in oil-and-gas exploration and production in several regions of the state. Plaintiffs' Second Amended Petition ("2d Am. Pet.") ¶¶ 20, 24. As part of their business operations, both entities operate oil and gas wells. *Id.* ¶ 24. On February 22, 2023, Slant Operating and Octane entered into a letter agreement whereby each entity agreed to a reciprocal waiver of any objections they had to the other's "off-lease penetration point" permit applications ("Letter Agreement"). *Id.* ¶¶ 31-33; Ex. 1. Specifically, Slant Operating agreed to waive its right to protest Octane's

---

[1] Plaintiffs' Second Amended Petition is the live pleading before the Court. Slant Holdings WTX II, LLC ("Slant Holdings") appeared as a plaintiff after Slant Operating filed its summary judgment motion. Slant Holdings did not file its own summary judgment on the same ground. The Court will therefore analyze Slant Operating's Motion only as to Slant Operating.

permit application to drill Octane's Green Gables Wells from a penetration point on Slant Operating's adjacent leasehold. *Id.* ¶ 33. Octane agreed to "waive its right to protest future Slant drilling permit applications insofar . . . as they concern Off Lease Penetration Points where Octane is the offset operator of record." *Id.* In addition to exchanging waivers, the parties also agreed to provide each other with "daily drilling, completion, and flowback reports for each of the [w]ells" and "[d]aily production data for each of the [w]ells." *Id.*, Ex. 1.

¶ 3 Following the execution of the Letter Agreement, Slant Operating fully performed its contractual obligation by waiving objections to Octane's plan to drill its five Green Gables Wells from a penetration point on Slant Operating's adjacent leasehold. *Id.* ¶ 36. Less than 18 months after the Letter Agreement was signed, Slant Operating sought to drill its Gardendale Wells from an off-lease penetration point on Octane's adjacent leasehold. *Id.* From June to August 2024, Slant Operating and Octane discussed a possible waiver of Octane's right to object to Slant Operating's application to drill the Gardendale Wells. *Id.* ¶¶ 38-40; Exs. 2-3. After Slant Operating formally requested the waiver, Octane informed Slant Operating it would not provide the waiver. *Id.* ¶ 41; Exs. 4-5. On September 16, 2024, after Slant Operating submitted its permit application to the Texas Railroad Commission ("RRC") without the waiver, Octane sent its official application objection to Slant Operating and the RRC. *Id.* ¶ 43.

**B.     Slant Operating commences suit in the Business Court, the parties move for summary judgment.**

¶ 4     On October 1, 2024, Slant Operating filed its Original Petition in the Business Court of Texas, bringing a single breach-of-contract claim. Plaintiffs filed first and second amended petitions.[2] Slant Operating brings several arguments in its pending summary-judgment motion:

> (1) The Letter Agreement is a valid contract that obligated Slant Operating to provide the Green Gables Wells waiver to Octane and Octane to provide the Gardendale Wells waiver to Slant Operating;
>
> (2) Slant fully performed its obligation under the contract by providing the Green Gables waiver upon request;
>
> (3) Octane breached the contract by not providing the Gardendale waiver upon request; and
>
> (4) Slant Operating incurred damages because of this breach.

*See* Slant Operating's Motion for Partial Summary Judgment ("Plaintiff's Mot.") at 5-8. Slant Operating also requests summary judgment on liability, leaving damages to be determined later. *See generally, id.*

¶ 5     Octane filed its competing motion for summary judgment, requesting the Court grant summary judgment in its favor because (1) certain parts of the Letter Agreement are too indefinite to enforce and (2) Slant Operating failed to exhaust administrative remedies before initiating suit. *See* Octane's Motion for Summary Judgment ("Def.'s Mot.") at 13, 22.

---

[2] Slant Operating subsequently filed the Second Amended Petition and added Slant Holdings and Slant Energy II, LLC as plaintiffs.

## II.     LEGAL STANDARD

¶ 6     Summary judgment is governed by Texas Rule of Civil Procedure 166a.  For a traditional motion for summary judgment, the movant "bears the burden to show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 865 (Tex. 2018) (citing TEX. R. CIV. P. 166a(c)).  To satisfy this burden, the movant must conclusively establish all essential elements of its claim by presenting evidence.  *See MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986) (per curiam).  The court must take all evidence favorable to the nonmovant as true and "indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *ConocoPhillips*, 547 S.W.3d at 865.

¶ 7     Once the movant satisfies its burden for summary judgment, the burden shifts to the nonmovant to provide evidence that raises a genuine issue of material fact.  *See Wal-Mart Stores, Inc. v. Xerox State & Loc. Sols., Inc.*, 663 S.W.3d 569, 583 (Tex. 2023).  If a fact issue is raised, the court cannot grant summary judgment.  *Mahoney v. Webber, LLC*, 608 S.W.3d 444, 447 (Tex. App.—Houston [1st Dist.] 2020, no pet.).  For a defendant's traditional motion for summary judgment, the defendant satisfies its burden by conclusively negating at least one element of the plaintiff's cause of action or proving all elements of an affirmative defense.  *Stanfield v. Neubaum*, 494 S.W.3d 90, 96 (Tex. 2016). The burden then shifts to the plaintiff to raise a fact issue to defeat summary judgment.  *Id.* at 97.

## III. OBJECTIONS TO SUMMARY-JUDGMENT EVIDENCE

¶ 8    Octane objects to three of Slant Operating's summary-judgment exhibits and one of Slant Operating's response exhibits.  As discussed below, Octane's objections are sustained in part and overruled in part.

### A. Exhibit B

¶ 9    Octane objects to Exhibit B within Slant Operating's Motion.  Exhibit B is a partial transcript of Octane attorney Joe Greenhill ("Greenhill")'s statements at the Court's January 7, 2025, hearing on jurisdiction.  The transcript statements attributable to Greenhill are as follows:

- The "most economically fiscal way" for Slant Operating to drill the Gardendale Wells was to drill off-lease on Octane's leasehold;

- "Octane agreed in a Letter Agreement to provide a waiver for future wells";

- Slant Operating provided the Green Gables Wells waiver to Octane;

- Octane declined to provide the Gardendale Wells waiver to Slant Operating; and

- The parties agree that the Letter Agreement is clear and controlling.

*See* Plaintiff's Mot. at 2–4, 6–7 (citing Ex. B at 35:7-8, 36:9, 36:24-37:2, 37:3-4, 47:11).

¶ 10    Octane asks the Court to strike Exhibit B because "[a]ttorney argument is not evidence" and the rules of evidence require admission of Greenhill's entire statements for context.  Octane's Response to Plaintiffs' Motion for Partial Summary Judgment ("Def.'s Resp.") at 11.  Attorney argument is generally not evidence, although unsworn attorney statements at a hearing may be deemed evidence "when the circumstances clearly indicate

that the attorney is tendering evidence on the record based on personal knowledge and the opposing party fails to object." *Vaccaro v. Raymond James & Assocs., Inc.*, 655 S.W.3d 485, 49192 (Tex. App.—Fort Worth 2022, no pet.). Greenhill's unsworn statements were not based on personal knowledge of the underlying case facts. Further, it appears that some of Slant Operating's representations of his oral argument were misinterpreted.[3] Therefore, Octane's objection is sustained and Exhibit B is stricken.[4]

## B. Exhibit C

¶ 11    Octane objects to Exhibit C, Slant Operating's July 12, 2024, request for the Gardendale Wells waiver as hearsay and incomplete evidence. Def.'s Resp. at 11. Exhibit C is not hearsay, as Slant Operating offered the exhibit to show that the waiver request was made, not to show the truth of any matter asserted within the request. *See* Plaintiff's Mot. at 3 ("[I]n reliance on the [Letter] Agreement, Slant sought reciprocal waivers from Octane for six wells."); TEX. R. EVID. 801(d); *Ash v. Hack Branch Distrib. Co.*, 54 S.W.3d 401, 411 (Tex. App.—Waco 2001, pet. denied). Regarding completeness, the evidentiary rule of optional completeness states that "[i]f a party introduces all or part of a writing or recorded statement an adverse party may introduce, at that time, any other part—or any other

---

[3] For example, Slant Operating claims that Greenhill stated the "most economically fiscal way" for Slant Operating to drill the Gardendale Wells was to drill off-lease on Octane's leasehold, but Greenhill actually stated "Slant decided it made plans to develop its Gardendale wells, and that the most economically fiscal way of doing that was to drill penetration points on leases for which Octane was the offsite operator." Plaintiff's Mot., Ex. B at 36:25-37:2. The Court interprets Greenhill to mean that *Slant Operating* made the determination that this was the most economical way to drill the wells, not that it was objectively the case (or that Octane agreed with that determination).

[4] As the exhibit has been stricken on independent grounds, the Court will not address Octane's remaining objection concerning Greenhill's deposition transcript.

writing or recorded statement—that in fairness ought to be considered at the same time."

TEX. R. EVID. 106. Put differently, and echoing Slant Operating's argument, the remedy for

an incomplete exhibit is not to strike it. *Jones v. Colley*, 820 S.W.2d 863, 866 (Tex. App.—

Texarkana 1991, writ denied) ("Rule 106, however, is not enforced by excluding the partial

statement, but by allowing the opposing party to contemporaneously introduce any other

part of the statement that should be considered with the portion introduced by the

proponent."); *see* Plaintiffs' Reply to Octane's Response to Plaintiffs' Motion for Partial

Summary Judgment ("Plaintiffs' Reply") at 20. Therefore, Octane's objections to Exhibit

C are overruled.

## C. Exhibit D

¶ 12    Octane objects to Exhibit D, a September 16, 2024, email from Octane

representative Jared Blong ("Blong") to the RRC objecting to Slant Operating's

Gardendale Wells drilling application. Octane argues incompleteness and claims the

exhibit is missing a necessary attachment. Def.'s Resp. at 11. For the same reasons set

forth above, Octane's objection is overruled.

## D. Exhibit A

¶ 13    Octane objects to Slant Operating's Response Exhibit A, the Declaration of

Slant Operating's counsel, Kenneth A. Young ("Young"), which lodges objections to

Young's statements:

- On February 22, 2023, Slant Operating, LLC and Octane Energy Operating, LLC entered into an agreement whereby each party mutually agreed to waive objections to certain of the opposing party's drilling permits.

- In the summer of 2024, in reliance on the [Letter Agreement], Slant sought reciprocal waivers from Octane for six wells: Gardendale 12-01 02WB, Gardendale 12-01 03MS, Gardendale 12-01 04MS, Gardendale 12-01 01WB, Gardendale 12-01 01MS, and Gardendale 12-01 02MS.

Plaintiff's Resp., Ex. A, ¶¶ 3, 5. Octane argues "[a]ffidavits submitted to a trial court in opposition to a motion for summary judgment must be made on personal knowledge." Octane's Reply in Support of Its Motion for Summary Judgment ("Def.'s Reply") at 2-3 (citing TEX. R. CIV. P. 166a(f); *Woods Expl. & Producing Co. v. Arkla Equip. Co.*, 528 S.W.2d 568 (Tex. 1975)). Young's statements, like Greenhill's, are not based on personal knowledge. Accordingly, Octane's objection to the above statements is sustained and the statements are stricken.

## IV. SLANT OPERATING'S PARTIAL MOTION FOR SUMMARY JUDGMENT

### A. Slant Operating has established liability.

¶ 14    Slant Operating has conclusively established that the parties entered into a valid, enforceable contract. To prevail on a breach-of-contract claim, the plaintiff must prove:

> (1) There is a valid contract;
>
> (2) the plaintiff performed its obligations under the contract;
>
> (3) the defendant breached the contract; and
>
> (4) the plaintiff sustained damages as a result of the breach.

*Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019). A valid, enforceable contract requires an offer, acceptance, consideration, a meeting of the minds (i.e., mutual assent) on the contract's essential terms, consent to those essential

terms, and execution and delivery of the contract with the intent it be mutual and binding. *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018); *see Tex. Gas Utils. Co. v. Barrett*, 460 S.W.2d 409, 412-13 (Tex. 1970) (discussing consideration as mutuality of obligation).

¶ 15    To obtain partial summary judgment on liability for breach of contract, Slant Operating must conclusively establish (1) the Letter Agreement was a valid, enforceable contract; (2) Slant Operating performed its obligations under the Letter Agreement; and (3) Octane breached the Letter Agreement.  *See Pathfinder Oil & Gas*, 574 S.W.3d at 890. The Court considers each element in turn.

1. *Valid, Enforceable Contract*

¶ 16    The Letter Agreement is a valid contract.  First, there was an offer in the form of the Letter Agreement.  Octane indicated that it agreed to the Letter Agreement's terms by executing it and the Letter Agreement was supported by consideration.  Slant Operating agreed to provide a waiver for Octane's Green Gables wells in exchange for various forms of production data.  Octane agreed to provide waivers for all future Slant Operating Wells, including Slant Operating's Gardendale wells, in exchange for the same kinds of data. There also appeared to be a meeting of the minds on the contract's essential terms and the parties' consent to those terms, as both parties executed the Letter Agreement.  Lastly, the partiers executed and delivered the Letter Agreement by signing and emailing copies to each other.  *See* Plaintiff's Mot., Ex. A.

*2. Performance*

¶ 17    Slant Operating has conclusively established that it performed its contractual obligations as set forth in the Letter Agreement.  It is uncontroverted that Slant Operating provided Octane a waiver for the Green Gables Wells.  Def.'s Resp. at 7 ("Slant and Octane revised the proposed [Green Gables Wells] waiver, which Slant signed."); Def.'s Resp., Ex. A-14.

*3. Breach*

¶ 18    Slant Operating has conclusively established Octane breached the Letter Agreement by refusing to provide a waiver and objecting to the off-lease drilling of the Gardendale Wells.  Plaintiff's Mot., Ex. D.  Octane admitted it did not provide the requested waiver.  *See* Def.'s Resp. at 10, 17-18, 21.

**B.    Octane fails to raise a genuine issue of material fact.**

*1. Slant Operating's claim is not based on a "nonexistent" agreement.*

¶ 19    Octane cannot prevail on its argument that an agreement does not exist. Consideration of Octane's argument requires the Court to use tools of contractual construction.  When construing contracts, courts are required to ascertain and effectuate the parties' intent as expressed in the contract. *Frost Nat. Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 311-12 (Tex. 2005).  The court focuses on "objective manifestations of intent, not what one side or the other alleges they intended to say but did not." *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 763-64 (Tex. 2018) (internal quotation marks omitted).  Courts consider the entire contract and "attempt to harmonize and give effect to all" provisions.

*Frost Nat. Bank*, 165 S.W.3d at 312. "If, after the pertinent rules of construction are applied, the contract can be given a definite or certain legal meaning, it is unambiguous" and can be construed as a matter of law. *Id.* However, if the contract is susceptible to more than one reasonable interpretation, it is ambiguous. *Id.* Contract interpretation and the determination of ambiguity are questions of law. *URI*, 543 S.W.3d at 763.

¶ 20   Octane argues it never promised to provide Slant Operating with—and Slant Operating never asked for—future waivers in exchange for the Green Gables waiver. Def.'s Resp. at 13. Instead, Octane asserts the plain language of the Letter Agreement indicates Slant Operating only requested production data in exchange for the Green Gables waiver, and Octane argues this is consistent with the parties' negotiations. *Id.* at 12. The Court disagrees.

¶ 21   Octane's interpretation of the parties' promises ignores the plain language of the Letter Agreement. *See* Plaintiff's Mot., Ex. A. The plain language reveals Octane promised to provide future waivers to Slant Operating, and Slant Operating promised to provide production data to Octane for those wells. The drafts and delivery were part of the negotiation process. *See* Def.'s Resp., Ex. A-3. Additionally, Blong's signature on the agreement indicates Octane agreed to the terms that were proposed by Slant Operating. *See Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 635 (Tex. 2007) ("Evidence of mutual assent in written contracts generally consists of signatures of the parties and delivery with the intent to bind."). Accordingly, the Court is not persuaded by Octane's argument to deny Slant Operating's Motion on this ground.

## 2. *The Letter Agreement is enforceable.*

¶ 22   Octane's argument that the Letter Agreement's Future Waiver Provision is an unenforceable "agreement to agree" fails. An enforceable contract requires a meeting of the minds on essential terms. *USAA*, 545 S.W.3d at 501 n.21. Contractual terms are essential if the parties would reasonably regard them as "vitally important ingredients of their bargain." *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016) (internal quotation marks omitted). An enforceable contract must address these essential terms with "a reasonable degree of certainty and definiteness" and "be sufficiently definite to confirm that both parties actually intended to be contractually bound." *Id.* (citing *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000)). Furthermore, "even when that intent is clear, the agreement's terms must also be sufficiently definite to enable a court to understand the parties' obligations and to give an appropriate remedy if they are breached." *Id.* (internal citations and quotation marks omitted). A contract's essential terms are determined on a case-by-case basis, and each contract should be considered separately to determine those terms. *Id.*

¶ 23   Whether an "agreement fails for lack of an essential term is a question of law to be determined by the court, unless there is ambiguity or unless surrounding facts and circumstances demonstrate a factual issue as to an agreement." *Power Reps, Inc. v. Cates*, No. 01-13-00856-CV, 2015 WL 4747215, at *7 (Tex. App.—Houston [1st Dist.] Aug. 11, 2015, no pet.) (mem. op.) (internal quotation marks omitted). Whether essential terms are too indefinite to enforce a contract is also a question of law. *Knowles v. Wright*, 288 S.W.3d

136, 142 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (citing *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 222 (Tex. 1992)).

¶ 24    The issue of indefiniteness can arise with agreements to enter contracts in the future.  Parties can agree to enter into future contracts.  *See Fischer*, 479 S.W.3d at 238.  However, when the essential terms are left open for future adjustment and agreement, there is no enforceable agreement—just an "agreement to agree."  *Id.* at 237.  To be enforceable, agreements to enter into future contracts must contain all of the future contract's essential terms.  *Id.* at 238 (citing *McCalla v. Baker's Campground, Inc.*, 416 S.W.3d 416, 418 (Tex. 2013) (per curiam)).

¶ 25    The Future Waiver Provision states:

> Furthermore, Octane agrees to waive its right to protest future Slant drilling permit applications insofar and only insofar as they concern Off Lease Penetration Points where Octane is the offset operator of record.  In exchange for any such waiver, Slant [Operating] would agree to provide to Octane the same data requested in Paragraphs 1 and 2 above.

Plaintiff's Mot., Ex. A.  Octane argues the Future Waiver Provision's language was merely a prospective "acknowledgment that the parties would be open to a future exchange of waivers for data on wells Slant [Operating] might decide to drill, if any."  Def.'s Resp. at 7-8.  Slant Operating argues it is enforceable because there were no terms left open for future negotiation.  Plaintiffs' Reply at 2.  Further, even if it was an agreement to agree, Slant Operating asserts it is enforceable because the parties agreed to all material terms.  Plaintiffs' Reply at 7-8.  The Court agrees with Slant Operating.

¶ 26    The Future Waiver Provision is undoubtedly sparse.  Octane argues it is missing "nearly every material term" and does not contain any of the same material terms as the Green Gables provision, including the identity of the future wells (names, permit numbers, and locations), well path plats, and when the future wells would be drilled or permitted.  Def.'s Resp. at 14-15.  But, considering the circumstances in which the Letter Agreement was drafted, the Court does not view specific identifying information or drilling and permitting plans necessary.

¶ 27    The terms of the Future Waiver Provision appear sufficiently definite to enable the Court to determine each party's obligations and offer an appropriate remedy for breach. Upon Slant Operating's request, Octane must provide Slant Operating a waiver to drill its future wells at off-lease penetration points on the adjacent Octane leasehold.  This extends to any property where Slant Operating and Octane operate neighboring wells.  In exchange for the waivers, Slant Operating provides production data to Octane.  There is no language in the Future Waiver Provision indicting a plan to further negotiate the agreement or its essential terms in the future.  While Octane argues that the use of "future" and "would agree" indicates the Future Waiver Provision is an unenforceable "agreement to agree," agreements using similar language have been deemed enforceable for containing all essential terms. *See* Def.'s Resp. at 13–14; *McCalla*, 416 S.W.3d at 417-18; Plaintiffs' Reply at 8.

¶ 28    To the extent Octane harps on a missing duration term, its absence does not automatically render an agreement unenforceable.  If a duration term is missing from a

contract, courts can infer a reasonable duration.[5] *See 1320/1390 Don Haskins, Ltd. v. Xerox Com. Sols., LLC*, 584 S.W.3d 53, 70-71 (Tex. App.—El Paso 2018, pet. denied); *WesternGeco, L.L.C. v. Input/Output, Inc.*, 246 S.W.3d 776, 783 (Tex. App.—Houston [14th Dist.] 2008, no pet.). Additionally, contracts contemplating continuous or successive performances that are indefinite in duration can be terminated at any party's will. *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 841 (Tex. 2000); *Clear Lake City Water Auth. v. Clear Lake Utils. Co.*, 549 S.W.2d 385, 390 (Tex. 1977).[6]

¶ 29   Lastly, assuming *arguendo* that the essential terms in the Future Waiver Provision are too uncertain or indefinite, principles related to part performance still render it enforceable. "Part performance under an agreement may remove uncertainty and establish that a contract enforceable as a bargain has been formed." *Fischer*, 479 S.W.3d at 239 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 34(2)). "When the parties' actions demonstrate that they intended to 'conclude a binding agreement, even though one or more terms . . . are left to be agreed upon . . . courts endeavor, if possible, to attach a sufficiently definite meaning to the bargain.'" *Id.* (quoting RESTATEMENT (SECOND) OF CONTRACTS § 33(2) cmt. a.). Accordingly, "[t]he law favors finding agreements sufficiently definite for

---

[5] A court can also reform a contract if it does not accurately reflect the parties' agreement due to mistake or fraud. *See Gilbane Bldg. Co. v. Keystone Structural Concrete, Ltd.*, 263 S.W.3d 291, 300-01 (Tex. App.—Houston [1st Dist.] 2007, no pet.) ("Equity has jurisdiction to reform written instruments in cases of mutual mistake, but a written contract will not be reformed in equity because of a mistake, in the absence of fraud, unless it is mutual."). Here, no party has asked the Court to reform the Letter Agreement.

[6] In cases where perpetual contracts contemplate one party spending substantial money to perform its obligations, courts imply a reasonable duration and provide the contract may not terminate at will. *Clear Lake City*, 549 S.W.2d at 391.

enforcement, particularly . . . where one of the parties has performed his part of the contract." *Id.* (internal quotation marks omitted).

¶ 30    Slant Operating performed its part of the Letter Agreement (which, of course, includes the Future Waiver Provision) by providing the Green Gables waiver to Octane. Slant Operating's partial performance suggests the parties intended to conclude a binding agreement and that the Letter Agreement was not merely an agreement to agree in the future. For these reasons, the Court finds that the Letter Agreement is enforceable as a matter of law.

*3. Slant Operating's construction of the Letter Agreement is not unreasonable, oppressive, or absurd.*

¶ 31    Octane cannot prevail on its argument that Slant Operating's construction of the Letter Agreement is unreasonable, oppressive, and would lead to absurd results. When construing a contract, courts typically do so "from a utilitarian standpoint bearing in mind the particular business activity sought to be served" and avoid applying a construction that is "unreasonable, inequitable, and oppressive." *Frost Nat. Bank*, 165 S.W.3d at 312. "[A] contract interpretation that allows one party to a contract to use unilateral discretion that results in inequitable consequences to the other party is unreasonable, inequitable, and oppressive." *HSM Adkisson Ranch, Ltd. v. Megatel Homes III, LLC*, No. 02-19-00213-CV, 2020 WL 3456128, at *3 (Tex. App.—Fort Worth June 25, 2020, pet. denied) (mem. op.) (citing *Frost Nat'l Bank*, 165 S.W.3d at 313) (internal quotation marks omitted). "However, parties make their own contracts, and it is not within the province of this court to vary their terms in order to protect them from the consequences

of their own oversights and failures." *Springer Ranch, Ltd. v. Jones*, 421 S.W.3d 273, 280 (Tex. App.—San Antonio 2013, no pet.) (internal quotation marks omitted).

¶ 32 A commonality for unreasonable, inequitable, and oppressive agreements is a party's sole discretion to act while the other party receives little to no benefit. *See e.g.*, *Frost Nat'l Bank*, 165 S.W.3d at 313 (lessee's construction of an equipment-lease agreement allows, at the lessee's discretion, the lessor to "essentially . . . forgo almost the entire rental value of the equipment and sell it almost new for twenty percent of its value, the same price it would receive for selling the equipment at the end of the lease term after collecting rent on it for sixty months"); *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987) (managing general partner's construction of a limited partnership agreement provides "the managing general partner the authority to drastically dilute the limited partner's $50,000 units so as to work a practical forfeiture"); *Hackberry Creek Country Club, Inc. v. Hackberry Creek Home Owners Ass'n*, 205 S.W.3d 46, 61–62 (Tex. App.— Dallas 2006, pet. denied) (association's construction of a membership agreement required country club "to operate a first-class, high quality, private country club" in perpetuity "regardless of its costs of performing, and prohibited [club] from realizing any benefits from the increase in its property values"); *HSM Adkisson Ranch*, 2020 WL 3456128, at *3 (seller's construction of a lot purchase contract allows seller to unilaterally and repeatedly extend the lot development deadline without notice and render the purchaser's termination right meaningless).

¶ 33    Octane claims Slant Operating's construction of the Letter Agreement is unreasonable, and oppressive, and would lead to absurd results because it allows Octane to receive waivers for the Green Gables Wells in exchange for "an essentially infinite number of wells requested by Slant [Operating] at any point in the future—no matter the circumstance, location, or cost to Octane." Def.'s Resp. at 16-17. Octane asserts Slant Operating's damage amount (over $10 million) far exceeds the amount Slant Operating previously offered to purchase Section 13 ($2.8 million), Octane's leasehold that contained the Gardendale Wells. *Id.* at 17. It claims this further shows the absurdity of Slant Operating's contract construction. *Id.* Notably, Octane offers no alternative construction of the Letter Agreement and does not allege ambiguity. The Court disagrees with Octane.

¶ 34    First, Octane contracted to receive two benefits: (1) waivers for the Green Gables Wells and (2) various forms of production data for *all* of Slant Operating's future wells for which it requests waivers. While providing waivers in perpetuity may seem oppressive to Octane, the same can be said for Slant Operating providing well production data in perpetuity to Octane. Because both parties freely contracted for their respective benefits under the Letter Agreement, the Court is not convinced the contract is unreasonable, inequitable, or oppressive akin to the above cases.

¶ 35    Regarding absurdity, Octane has not produced any evidence supporting its absurdity argument. "Unless it is quite impossible that a rational person could have intended the result that follows from enforcing unambiguous contract language, courts should enforce the language, even if the parties' agreement yields an inequitable or

improvident result." *Fairfield Indus., Inc. v. EP Energy E&P Co., L.P.*, 531 S.W.3d 234, 250 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (internal quotation marks omitted). "This standard makes it especially difficult to prevail under the absurdity doctrine." *Id.* A rational person reads the Future Waiver Provision and ascertains Octane is indefinitely required to provide requested waivers for Slant Operating's future wells. Therefore, even if the result of the parties' bargain is inequitable to Octane, absurdity is inapplicable here.

¶ 36   Further, Octane has offered no compelling reasons to disturb the parties' choice to enter into the Letter Agreement. During negotiations, Octane had ample opportunities to review the Letter Agreement's terms and propose language modification, to the Future Waiver Provision. That Octane now regrets entering into the deal is not reason enough for the Court to find the deal unreasonable, oppressive, or absurd. *See Rubinstein v. Lucchese, Inc.*, 497 S.W.3d 615, 625 (Tex. App.—Fort Worth 2016, no pet.) ("Parties to a contract are masters of their choices and are entitled to select what terms and provisions to include in or omit from a contract."); *Phila. Indem. Ins. v. White*, 490 S.W.3d 468, 471 (Tex. 2016) ("Absent compelling reasons, courts must respect and enforce the terms of a contract the parties have freely and voluntarily entered.").

¶ 37   And, considering the parties' experience in the oil-and-gas industry, it is difficult to believe that Octane would agree to oppressive deal terms. *See Finley Res., Inc. v. Headington Royalty, Inc.*, 672 S.W.3d 332, 344 (Tex. 2023) (when interpreting contracts, in addition to commercial setting and trade custom, "courts may consider the

sophistication of the parties . . . which carr[ies] an expectation that the parties were aware of what to bargain for and understood the terms of their written agreement").

¶ 38    Based on the foregoing, the Court does not characterize Slant Operating's construction of the Letter Agreement's Future Waiver Provision as unreasonable, oppressive, and or leading to absurd results.

### 4. Slant Operating was not required to exhaust administrative remedies.

¶ 39    Slant Operating did not fail to exhaust administrative remedies before filing suit. A plaintiff is required to exhaust all administrative remedies prior to filing suit if a state agency has exclusive jurisdiction over the dispute. *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 221 (Tex. 2002). If the plaintiff fails to exhaust these remedies before filing suit, the trial court will be deprived of subject-matter jurisdiction and must dismiss the case. *Id.* Whether an agency has exclusive jurisdiction over a dispute is up to the legislature. "An agency has exclusive jurisdiction when a pervasive regulatory scheme indicates that Congress intended for the regulatory process to be the exclusive means of remedying the problem to which the regulation is addressed." *Id.* (internal quotation marks omitted).

¶ 40    Whether an agency has exclusive jurisdiction is a question of statutory construction. *City of Richardson v. Bowman*, 555 S.W.3d 670, 679 (Tex. App.—Dallas 2018, pet. denied). Statutory construction is a question of law. *Cadena Comercial USA Corp. v. Tex. Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 325 (Tex. 2017). The goal of statutory construction is to ascertain and effectuate legislative intent. *Id.* Legislative

intent is expressed in the plain and common meaning of the statutory text "unless a different meaning is supplied, is apparent from the context, or the plain meaning of the words leads to absurd or nonsensical results." *Id.* Courts presume the legislature chose the statutory text "with care, including each word chosen for a purpose, while purposefully omitting words not chosen." *Id.*

¶ 41  The Texas Legislature has tasked the RRC with adopting and enforcing rules to prevent waste and protecting correlative rights. TEX. NAT. RES. CODE § 86.042(1)-(2), (5); *see id.* §§ 86.082–.083. One such rule is Statewide Rule 86 ("RRC Rule 86"), which was codified in the Texas Administrative Code. *See* 16 TEX. ADMIN. CODE § 3.86. In addition to setting forth procedures for the approval of horizontal drain hole drilling applications (including off-lease drillings), RRC Rule 86 also provides that the RRC can grant exceptions to these procedures to prevent waste and protect correlative rights. *Id.* § 3.86(h)(1). But nothing in Rule 86 discusses the RRC's ability to adjudicate contract disputes between oil-and-gas companies or leaseholders.

¶ 42  Nothing indicates the legislature intended to give the RRC exclusive jurisdiction over the type of breach-of-contract claim before the Court. *Compare* TEX. NAT. RES. CODE § 86.042, *and* 16 TEX. ADMIN. CODE § 3.86, *with* TEX. UTIL. CODE §§ 15.001, 17.157, 32.001 (granting the Texas Public Utility Commission exclusive jurisdiction over contract claims against regulated entities regarding failure to provide services). There are no rules or statutes that indicate the RRC has exclusive jurisdiction over contract claims where the RRC is not a party.

¶ 43    Here, Octane asserts Slant Operating's claim that it lost millions of dollars in revenue from the alleged breach "implicate[s] a claim of waste and Slant's correlative rights to oil under its own property," triggering the need to exhaust administrative remedies. Def.'s Resp. at 19.  Further, Octanes argues a successful hearing before the RRC to get permission to drill the Gardendale Wells off lease would have mitigated Slant Operating's damages and obviated the need to file suit.  *Id.* at 20-21.  The Court disagrees.

¶ 44    First, Octane has not presented any statutory law, case law, or administrative rules or decisions otherwise indicating that the RRC had exclusive jurisdiction over this dispute.  Further, there is no clear indication that the legislature intended to abrogate common-law rights, such as filing suit in a court of law for breach of contract. *See Forest Oil Corp. v. El Rucio Land & Cattle Co.*, 518 S.W.3d 422, 428 (Tex. 2017).  Moreover, a successful hearing before the RRC would not have mooted a breach-of-contract claim against Octane.  Even if the RRC granted Slant Operating's application to drill the Gardendale Wells on Octane's leasehold, Octane would have breached the Letter Agreement by not providing the requested waiver, and Slant Operating would have a breach-of-contract claim.  Slant Operating would still suffer damages, including expenses related to the drilling redesign.

¶ 45    Therefore, the Court finds Slant Operating was not required to exhaust administrative remedies before suing Octane.

*5. Waiver, estoppel, and excuse do not apply.*

    i.    <u>Waiver</u>

¶ 46    Octane cannot prevail on its waiver argument. Waiver is "an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003) (per curiam).  Waiver focuses on a party's intent, although that intent need not be explicit.  *LaLonde v. Gosnell*, 593 S.W.3d 212, 219 (Tex. 2019).  "A party's conduct sufficiently demonstrates intent to waive a right if, in light of the surrounding facts and circumstances, it is unequivocally inconsistent with claiming that right." *Id.* (internal quotation marks omitted).  Although waiver is typically a question of fact, it can become a question of law when the surrounding facts are undisputed.  *Jernigan*, 111 S.W.3d at 156.

¶ 47    Octane argues Slant Operating is precluded from summary judgment because Slant Operating did not initially request a waiver for the Gardendale Wells when it became aware Octane was trying to sell Section 13.  *See* Def.'s Resp. at 21-22.  Octane argues it was only after five months into exclusive negotiations with another party to sell Section 13 did Slant Operating "reverse[] its position, demand[] waivers, and file[] suit against Octane." *Id.* at 22.  It asserts Slant Operating "led Octane to believe that it would not seek such waivers or interfere with the sale," and believes this ultimately raises fact issues and precludes summary judgment.  *Id.*  The Court disagrees.

¶ 48    Octane has presented no evidence that Slant Operating intentionally relinquished the right it had under the Letter Agreement to request waivers or that Slant

Operating's conduct was inconsistent with claiming that right. The emails Octane submitted to support a waiver theory demonstrate Slant Operating's decision not to immediately request a waiver for the Gardendale Wells when it became aware that Octane was negotiating the sale of Section 13 with another party. *See* Def.'s Resp. at 21–22; Def.'s Resp., Exs. A-7, A-8, A-11, A-12, A-15. Although Slant Operating offered to purchase the leasehold, the parties never reached a deal. After Octane informed Slant Operating another party had exclusive rights to purchase Section 13, and after Slant Operating's offer to purchase the land was not accepted, Slant Operating requested a waiver for the Gardendale Wells. *See* Def.'s Resp., Ex. A-7 to A-13. The evidence shows Slant Operating had a continual interest in developing at least part of Section 13 via ownership (by purchasing the land from Octane) or off-lease drilling.[7] That Slant Operating initially sought to purchase land is not evidence it intentionally relinquished the right to request a future waiver from Octane. In other words, Slant Operating's conduct did not demonstrate an unequivocal intent to waive a right. *See Jernigan*, 111 S.W.3d at 157-58. Octane cannot prevail on its waiver argument.

ii.    Estoppel or Quasi-Estoppel

¶ 49    Octane has failed to present evidence proving estoppel or quasi-estoppel. Estoppel is "conduct which causes the other party to materially alter his position in reliance on that conduct." *Inimitable Grp., L.P. v. Westwood Grp. Dev. II, Ltd.*, 264 S.W.3d 892, 902

---

[7] Slant Operating owned the land immediately to the north and south of Section 13, further incentivizing property development. *See* Def.'s Resp., Ex. A-10.

(Tex. App.—Fort Worth 2008, no pet.).  The doctrine "prevents one party from misleading another to the other's detriment or to the misleading party's own benefit." *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008).  Estoppel has five elements:

> (1) a false representation or concealment of material facts, (2) made with knowledge, actual or constructive, of those facts, (3) with the intention that it should be acted on, (4) to a party without knowledge or means of obtaining knowledge of the facts, (5) who detrimentally relies on the representations.

*Inimitable Grp.*, 264 S.W.3d at 902.  Quasi-estoppel applies "when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit." *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000).  Quasi-estoppel does not require a false representation or detrimental reliance. *Forney 921 Lot Dev. Partners I, L.P. v. Paul Taylor Homes, Ltd.*, 349 S.W.3d 258, 268 (Tex. App.—Dallas 2011, pet. denied).

¶ 50   There is no evidence that Slant Operating made false representations to Octane or that Octane relied on such representations to its detriment.  Slant Operating never expressed it would not seek future waivers related to Section 13.  And, as discussed, Slant Operating's unsuccessful attempt to purchase Section 13 is independent from its subsequent Gardendale Wells waiver request.  Accordingly, Octane does not have a viable estoppel or quasi-estoppel defense.

iii.   Excuse

¶ 51   Excuse is inapplicable to Slant Operating.  Excuse is an affirmative defense that excuses a party from performing its contractual obligations if the other party commits

a material breach.[8] *Orr v. Broussard*, 565 S.W.3d 415, 422 (Tex. App.—Houston [14th Dist.] 2018, no pet.). Octane has not alleged or provided evidence showing that Slant Operating committed a material breach of the Letter Agreement. Therefore, excuse also does not apply.

¶ 52    Based on the foregoing, Slant Operating's Motion is **GRANTED**.

## V.    OCTANE'S MOTION FOR SUMMARY JUDGMENT

¶ 53    Octane seeks summary judgment on Slant Operating's breach-of-contract claim. Octane largely asserts the same arguments in its motion as it does in response to Slant Operating's motion.[9] Therefore, the Court adopts its above findings.

¶ 54    Accordingly, Octane's Motion for Summary Judgment is **DENIED**.

## VI.    CONCLUSION

¶ 55    The Court concludes Slant Operating is entitled to partial summary judgment on liability. The Letter Agreement was an enforceable agreement into which Octane freely entered. Slant Operating fulfilled its contractual obligations by providing Octane the Green Gables Wells waiver upon request and Octane breached the Letter Agreement by not providing the Gardendale Wells waiver.

---

[8] Octane claims excuse is also a viable affirmative defense but did not brief the issue.

[9] Octane did not re-assert its affirmative defenses (waiver, estoppel, and excuse). However, in Octane's Reply in Support of its Motion for Summary Judgment, it raises the novel issue of whether Slant Operating has authority to bring its claim against Octane because it added two additional Plaintiffs. *See* Def.'s Reply at 1. The Court concludes Slant Operating, as a signatory to the Letter Agreement, has standing to bring a contract claim against Octane and, for the reasons set forth in this Opinion, is entitled to partial summary judgment. The Court analyzes the third-party beneficiary issue in a separate Order and Opinion.

¶ 56    Consistent with this opinion, it is **ORDERED** that Slant Operating's Motion for Partial Summary Judgment is **GRANTED**.    It is further **ORDERED** that Octane's Motion for Summary Judgment is **DENIED**.

_____
JERRY D. BULLARD
Judge of the Texas Business Court,
Eighth Division

SIGNED: December 22, 2025.